GREEN v. KEARNEY

[217 N.C. App. 65 (2011)]

LARRY DONNELL GREEN, BY AND THROUGH HIS GUARDIAN AD LITEM, SHARON CRUDUP; LARRY ALSTON, INDIVIDUALLY; AND RUBY KELLY, INDIVIDUALLY, PLAINTIFFS v. WADE R. KEARNEY, II; PAUL KILMER; KATHERINE ELIZABETH LAMELL; PAMELA BALL HAYES; RONNIE WOOD; PHILLIP GRISSOM, JR.; DR. J.B. PERDUE, INDIVIDUALLY, AND IN HIS OFFICIAL CAPACITY AS MEDICAL EXAMINER OF FRANKLIN COUNTY; LOUISBURG RESCUE AND EMERGENCY MEDICAL SERVICES, INC.; FRANKLIN COUNTY EMERGENCY MEDICAL SERVICES; EPSOM FIRE AND RESCUE ASSOCIATION, INC.; AND FRANKLIN COUNTY, NORTH CAROLINA, A BODY POLITIC, DEFENDANTS

No. COA11-439

(Filed 15 November 2011)

## 1. Immunity—EMS providers—failure to provide medical treatment based on erroneous belief victim dead—failure to show intentional wrongdoing or deliberate misconduct—summary judgment

The trial court did not err by granting summary judgment and dismissing plaintiff accident victim's various negligence claims against defendant EMS providers arising from defendants' failure to determine that plaintiff was alive and thus their failure to provide any medical treatment because they believed he was dead. Defendants' claims of immunity under N.C.G.S. § 90-21.14 were not inappropriate since plaintiff failed to forecast any intentional wrongdoing or deliberate misconduct.

## 2. Evidence—exclusion of affidavits—improper legal conclusions for gross negligence and intentional wrongdoing

The trial court properly struck various affidavits filed by plaintiff because these affidavits sought to present evidence of the legal conclusion that defendants were grossly negligent or engaged in wanton conduct or intentional wrongdoing. It would be improper for a jury to hear expert testimony as to whether a certain legal standard has been met. Even if the affidavits were considered, they did not present any new information as to the underlying factual premise or any facts to support a forecast of gross negligence.

Appeal by plaintiff Larry Donnell Green by and through his Guardian *ad litem*, Sharon Crudup, from orders entered 20 December 2010 by Judge Henry W. Hight, Jr. in Superior Court, Franklin County. Heard in the Court of Appeals 29 September 2010.

*Bell & Vincent-Pope, P.A., by Judith M. Vincent-Pope, for plaintiff-appellant.*

*Troutman Sanders, L.L.P., by Gary S. Parsons and Whitney S. Waldenburg, for defendant-appellees Pamela Ball Hayes, Ronnie Wood, and Louisburg Rescue and Emergency Medical Services, Inc.*

*Young Moore and Henderson, P.A., by David M. Duke, Brian O. Beverly, and Michael S. Rainey, for defendant-appellee Wade R. Kearney II*

STROUD, Judge.

Plaintiff appeals the trial court's orders granting summary judgment in favor of defendants.[1] Because defendants are immune from liability under N.C. Gen. Stat. § 90-21.14, we affirm.

## I. Background

This is the second appeal before this Court arising out of the treatment of Mr. Larry Green following his accident on 24 January 2005. *See Green v. Kearney,* ___ N.C. App. ___, ___, 690 S.E.2d 755, 758-59 (2010) *("Green I").* Although the prior appeal addressed only the dismissal of plaintiffs' claims against defendant Dr. J.B. Perdue, the factual circumstances surrounding the accident and Mr. Green's treatment are the same, and were described in the prior opinion as follows:

> The facts as alleged in plaintiffs' complaint show that on 24 January 2005, at approximately 8:53 p.m., emergency services were dispatched in Franklin County, North Carolina to the scene of an accident involving a pedestrian—Green--and a motor vehicle. Green suffered an open head wound as a result of the accident. Defendant Wade Kearney ("Kearney") with the Epsom Fire Department was the first to arrive at the scene and checked Green for vital signs. Kearney determined that Green was dead and did not initiate efforts to resuscitate him.

1. We will refer only to Larry Donnell Green, by and through his Guardian *ad litem,* Sharon Crudup, as "plaintiff," as the individual plaintiffs did not appeal the dismissal of their individual claims. We will refer to Wade R. Kearney, II, Pamela Ball Hayes, Ronnie Wood, and Louisburg Rescue and Emergency Medical Service, Inc., collectively as "defendants" as they are the defendants who remained in the case at the time of the trial court's orders which are the subject of this appeal.

Several minutes later, defendants Paul Kilmer ("Kilmer") and Katherine Lamell ("Lamell") with Franklin County EMS arrived. Kearney asked Kilmer to verify that Green did not have a pulse, but Kilmer declined to do so, stating that Kearney had already checked and that was sufficient. Without checking the pupils or otherwise manually rechecking for a pulse, Kearney and Kilmer placed a white sheet over Green's body.

At approximately 9:00 p.m., defendants Pamela Hayes ("Hayes") and Ronnie Wood ("Wood") with the Louisburg Rescue Unit arrived at the scene. After being informed by Kearney and Kilmer that Green was dead, neither Hayes nor Wood checked Green for vital signs. At around 9:31 p.m., Perdue, the Franklin County Medical Examiner, arrived at the scene. He first conducted a survey of the scene, taking notes regarding the location of Green's body and the condition of the vehicle that struck him. Once the Crime Investigation Unit arrived, Perdue inspected Green's body. While Perdue was examining Green, eight people saw movement in Green's chest and abdomen. Kearney asked Perdue whether Green was still breathing and Perdue responded: "That's only air escaping the body." Once Perdue finished examining Green, he directed that Green should be taken to the morgue located at the Franklin County jail.

At approximately 10:06 p.m., Green was transported to the morgue by Hayes and Wood where Perdue examined him. Perdue lifted Green's eyelids, smelled around Green's mouth to determine the source of an odor of alcohol that had been previously noted, and drew blood. During this particular examination, Perdue, Hayes, and Wood all observed several twitches in Green's upper right eyelid. Upon being asked if he was sure Green was dead, Perdue responded that the eye twitch was just a muscle spasm. Plaintiffs claim that Hayes did not feel comfortable with Perdue's response and went outside to report the eye twitch to Lamell. Hayes then returned inside and asked Perdue again if he was sure Green was dead. Perdue reassured Hayes that Green was, in fact, dead. Green was then placed in a refrigeration drawer until around 11:23 p.m. when State Highway Patrolman Tyrone Hunt ("Hunt") called Perdue and stated that he was trying to ascertain the direction from which Green was struck. To assist Hunt, Perdue removed Green from the drawer and unzipped the bag in which he was sealed. Perdue then noticed movement in Green's abdomen and summoned emergency services. Green was

rushed to the hospital where he was treated from 25 January 2005 to 11 March 2005. Green was alive at the time this action was brought. His exact medical condition is unknown, though plaintiffs allege that he suffered severe permanent injuries.

___ N.C. App. at ___, 690 S.E.2d at 758-59. There is no dispute that Mr. Green was immediately disabled by his injuries. On 21 February 2005, Mr. Larry Alston, Mr. Green's father, was appointed as Mr. Green's Interim General Guardian. "On 22 May 2008, Green, through his guardian *ad Litem*, and Green's parents, Larry and Kelly Alston, brought this action in Franklin County Superior Court." *See id.* at ___, 690 S.E.2d at 759.

The complaint alleges the factual circumstances as summarized above, and based upon those facts, five claims for relief. Only the first, third, and fourth claims are applicable to defendants in this case. The first claim alleges general negligence on the part of defendants Wade R. Kearney II ("Kearney"), Pamela Ball Hayes ("Hayes"), Ronnie Wood ("Wood"), and Louisburg Rescue and Emergency Medical Services, Inc. ("Louisburg Rescue"). The third claim is against defendants for negligent infliction of emotional distress upon Mr. Green's parents. The fourth claim is against defendants for "Willful and Wanton Negligence[;]" this claim states that the negligent acts already described constitute "willful and wanton" conduct which "entitles Green to punitive damages." Defendants filed motions for partial summary judgment as to the claim for negligent infliction of emotional distress, and on 12 March 2009, the trial court granted the motions for partial summary judgment as to this claim.

On 15 November 2010, defendants Hayes, Wood, and Louisburg Rescue filed a motion for summary judgment as to "all remaining claims against them[.]" Defendants Hayes, Wood, and Louisburg Rescue alleged, *inter alia,* they "are immune from liability to Plaintiff pursuant to G.S. § 90-21.14." On 16 November 2010, defendant Kearney filed a motion for summary judgment as to "all claims remaining against him," also alleging, *inter alia,* immunity. On 13 December 2010, defendants filed motions to strike various affidavits on the grounds that each affidavit "improperly attempt[ed] to offer the witnesses' legal conclusions purportedly drawn from underlying evidence, and that except the Affidavit of George Wittenburg, MD, PhD, these Affidavits fail to state that the affiants are familiar with the standard of care in Franklin County or similarly situated communities[;]" that same day, the trial court heard the motions to strike and the motions for summary judgment. On 20 December 2010, the trial

court struck the contested affidavits and granted summary judgment in favor of defendants. Upon entry of the 20 December 2010 orders, all claims as to all defendants had been dismissed. Plaintiff filed notices of appeal from the 20 December 2010 orders.

## II. Immunity

[1] Plaintiff argues that the trial court erred by granting summary judgment dismissing his claims against defendants because "[d]efendants' [c]laims of [i]mmunity on the [g]rounds of N.C. Gen. Stat. § 90-21.14 are [i]nappropriate, since [p]laintiffs have [e]stablished that the [i]njuries [s]ustained by [p]laintiff were [c]aused by [d]efendants' [g]ross [n]egligence, and [w]illful and [w]anton [c]onduct[.]"

> This Court's standard of review is *de novo*, and we view the evidence in the light most favorable to the non-movant. The standard of review for an order granting a motion for summary judgment
>
>> requires a two-part analysis of whether, (1) the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact; and (2) the moving party is entitled to judgment as a matter of law.

*Honeycutt v. Honeycutt*, ___ N.C. App. ___, ___, 701 S.E.2d 689, 694 (2010) (citations and quotation marks omitted).

N.C. Gen. Stat. § 90-21.14 grants immunity as to first aid or emergency treatment rendered under certain circumstances:

> (a) Any person, including a volunteer medical or health care provider at a facility of a local health department as defined in G.S. 130A-2 or at a nonprofit community health center or a volunteer member of a rescue squad, who receives no compensation for his services as an emergency medical care provider, who renders first aid or emergency health care treatment to a person who is unconscious, ill or injured,
>
>> (1) When the reasonably apparent circumstances require prompt decisions and actions in medical or other health care, and
>>
>> (2) When the necessity of immediate health care treatment is so reasonably apparent that any delay in the rendering of the treatment would seriously worsen the physical condition or endanger the life of the person,

shall not be liable for damages for injuries alleged to have been sustained by the person or for damages for the death of the person alleged to have occurred by reason of an act or omission in the rendering of the treatment unless it is established that the injuries were or the death was caused by gross negligence, wanton conduct or intentional wrongdoing on the part of the person rendering the treatment.

N.C. Gen. Stat. § 90-21.14 (2005). Plaintiff's brief does not dispute the applicability of N.C. Gen. Stat. § 90-21.14(1) and (2). Thus, in order to prevail, plaintiff must forecast evidence that his injuries were "caused by gross negligence, wanton conduct or intentional wrongdoing on the part of the person rendering the treatment[,]" specifically, defendants. *Id.*

Considering "the evidence in the light most favorable" to plaintiff, *Honeycutt* at ___, 701 S.E.2d at 694, we must determine whether the evidence forecasts negligence which rises to the level of "gross negligence, wanton conduct, or intentional wrongdoing." N.C. Gen. Stat. § 90-21.14.

In determining or defining gross negligence, this Court has often used the terms willful and wanton conduct and gross negligence interchangeably to describe conduct that falls somewhere between ordinary negligence and intentional conduct. We have defined gross negligence as wanton conduct done with conscious or reckless disregard for the rights and safety of others. An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others. Our Court has defined willful negligence in the following language:

An act is done wilfully when it is done purposely and deliberately in violation of law or when it is done knowingly and of set purpose, or when the mere will has free play, without yielding to reason. The true conception of wilful negligence involves a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another, which duty the person owing it has assumed by contract, or which is imposed on the person by operation of law.

It is clear from the foregoing language of this Court that the difference between ordinary negligence and gross negligence is substantial. As this Court has stated:

An analysis of our decisions impels the conclusion that this Court, in references to gross negligence, has used that term in the sense of wanton conduct. Negligence, a failure to use due care, be it slight or extreme, connotes inadvertence. Wantonness, on the other hand, connotes intentional wrongdoing. Where malicious or wilful injury is not involved, wanton conduct must be alleged and shown to warrant the recovery of punitive damages. Conduct is wanton when in conscious and intentional disregard of and indifference to the rights and safety of others.

Thus, the difference between the two is not in degree or magnitude of inadvertence or carelessness, but rather is intentional wrongdoing or deliberate misconduct affecting the safety of others. An act or conduct rises to the level of gross negligence when the act is done purposely and with knowledge that such act is a breach of duty to others, i.e., a conscious disregard of the safety of others. An act or conduct moves beyond the realm of negligence when the injury or damage itself is intentional.

*Yancey v. Lea*, 354 N.C. 48, 52-53, 550 S.E.2d 155, 157-58 (2001) (citations and quotation marks omitted).

We have no prior cases under N.C. Gen. Stat. § 90-21.14 to provide guidance as to factors which may elevate ordinary negligence by a volunteer emergency medical provider to gross negligence, and thus we turn to other types of cases which have addressed this issue. In the context of motor vehicle accidents, our Supreme Court has noted that

[o]ur case law as developed to this point reflects that the gross negligence issue has been confined to circumstances where at least one of three rather dynamic factors is present: (1) defendant is intoxicated; (2) defendant is driving at excessive speeds; or (3) defendant is engaged in a racing competition. In some of these cases, a combination of the above factors are present.

*Id.* at 53-54, 550 S.E.2d at 158 (citations omitted).

Cases dealing with pursuits by law enforcement officers are also instructive in our consideration of gross negligence as those cases address immunity conferred on officers who are responding to emergency situations in a manner quite similar to emergency medical responders:

Our Supreme Court has held that in any civil action resulting from the vehicular pursuit of a law violator, the gross negligence

standard applies in determining the officer's liability. Gross negligence has been defined as wanton conduct done with conscious or reckless disregard for the rights and safety of others. An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.

Our Courts have discussed several factors as relevant to the issue of whether the conduct of a law enforcement officer engaged in pursuit of a fleeing suspect meets the grossly negligent standard. These factors, although not dispositive standing alone, include: (1) the reason for the pursuit; (2) the probability of injury to the public due to the officer's decision to begin and maintain pursuit; and (3) the officer's conduct during the pursuit.

*Lunsford v. Renn*, ___ N.C. App. ___, ___, 700 S.E.2d 94, 98 (2010) (citations, quotation marks, and footnote omitted), *disc. review denied*, 365 N.C. 193, 707 S.E.2d 244 (2011).

Here, the factual situation is complicated by the fact that each defendant is subject to various rules and protocols which set forth the standards for the medical care which should be provided to a person in plaintiff's situation and the delegation of authority to particular types of responders. In other words, the situation presented to each defendant, upon arrival at the scene of the accident, was somewhat different. From the facts as provided in *Green I*, we know that Kearney responded to a dispatch made at 8:53 p.m.; by 9:00 p.m. Hayes and Wood of Louisburg Rescue had arrived, and at some point within this seven minutes "Paul Kilmer . . . and Katherine Lamell . . . with Franklin County EMS arrived." *Green*, ___ N.C. App. at ___, 690 S.E.2d at 758. Furthermore, "[a]t around 9:31 p.m., Perdue, the Franklin County Medical Examiner, arrived at the scene." *Id*. at ___, 690 S.E.2d at 759.

Plaintiff correctly notes that "[t]here is a lack of North Carolina case law on what constitutes gross negligence and willful and wanton conduct for EMS providers" and thus urge us to consider Illinois law, as Illinois courts have dealt with these issues many times. In considering Illinois law, we find *Fagocki v. Algonquin Fire Protection Dist.*, 496 F.3d 623 (7th Cir. 2007), to be extremely instructive on the issue. In *Fagocki*, the Seventh Circuit United States Court of Appeals considered the defendant's appeal of a jury verdict in favor of the plaintiff who alleged a claim based upon the "willful and wanton misconduct" of the emergency medical providers under Illinois law. *Id*. at 624-26 (citation and quotation marks omitted).

**GREEN v. KEARNEY**

[217 N.C. App. 65 (2011)]

Illinois's Emergency Medical Services Systems Act provided that a licensed emergency medical services provider, such as the defendant paramedic service, who in good faith provides emergency medical services in the normal course of conducting their activities, or in an emergency, shall not be civilly liable as a result of their acts or omissions in providing such services unless such acts or omissions constitute willful and wanton misconduct. The purpose of thus exempting emergency medical providers from liability for mere negligence is to encourage emergency response by trained medical personnel without risk of malpractice liability for every bad outcome or unfortunate occurrence. Emergency situations are often fraught with tension, confusion, and as here, difficult physical locations for giving medical care. Emergency personnel must not be afraid to do whatever they can under less than ideal circumstances.

At common law, rescuers were fully liable for any negligence committed by them in the course of the rescue. This made sense when the intervention of an incompetent worsened the patient's condition or precluded intervention by a competent rescuer. But it had a tendency (as the Illinois cases emphasize) to deter even competent rescuers from volunteering their services, since if the rescue failed they might face a lawsuit. The problem is especially acute if, as in a case such as this, the rescuer cannot seek restitution for the benefit conferred by a successful rescue. Nevertheless if the negligence system operated with a zero error rate, and if a successful defendant could recoup his attorney's fees, the rescuer would have no fear about having to defend against such a suit. But these conditions are not satisfied. Judges, jurors, and lawyers make mistakes and litigants in ordinary civil litigation bear their litigation expenses even when they win. In addition, an employer is liable, by virtue of the doctrine of respondeat superior, for the negligent acts of an employee even if there was no way the employer could have prevented them.

So Illinois has decided to restrike the balance by exempting licensed providers of emergency medical treatment from liability for negligence. They remain liable if they are willful and wanton, but what does that doublet mean? The definitions in the Illinois cases are not very helpful, in part because general statements often make a poor match with specific facts and in part because the definitions are not uniform.

*Id.* at 626-27.

The Court in *Fagocki* went on to discuss the definitions of "willful and wanton" conduct under Illinois law. *Id.* at 627. In particular, one Illinois case states that "willful and wanton" conduct exhibits "an utter indifference to or conscious disregard for safety[,]" while another case notes that "willful and wanton may be synonymous with gross negligence[.]" *Id.* (citations and quotation marks omitted). The Court then analyzed Illinois cases "in which paramedics are accused of willful and wanton misconduct" and noted that there is a "high threshold for liability" but nonetheless there are at least three cases in which "the paramedics lost." *Id.*

One of these three cases is the sole Illinois case cited in plaintiff's brief, wherein paramedics

> responded to a 911 call by a woman who told the 911 operator that she was having an asthmatic attack and thought she was dying. The paramedics arrived at the woman's apartment, knocked on the door, heard nothing, and left. The door was unlocked, but they had not bothered to turn the doorknob. She died.

*Id.* at 627-28.

In another case,

> The paramedics knew that the plaintiff's decedent, killed when the stretcher she was on collapsed was not secured to the stretcher, that the stretcher's legs were not locked, that the paramedics placed the stretcher on a pothole, making it highly unstable, and that, despite their knowledge of the instability of the stretcher, they did not maintain physical contact with the stretcher.

*Id.* at 628 (citation, quotation marks, and brackets omitted).

> In the third case . . . the court ruled that a complaint was sufficient to state a claim against paramedics when it alleged that despite defendants' knowledge prior to their arrival on the scene that decedent was having difficulty breathing and her throat was closing due to an allergic reaction, and despite their training and standard operating procedures and accepted emergency practices, they waited between seven and eight minutes to administer two of the necessary medications and never administered the third.

*Id.*

The Court then analyzed the evidence presented in the case before it, in which the plaintiff's decedent suffered "irreversible brain damage" and ultimately died. *Id.* at 626. The plaintiff's decedent suffered from anaphylactic shock due to a food allergy and then was subjected to a series of medical errors. *Id.* at 625-26. The paramedics repeatedly failed to administer the proper medications, allowed the decedent to fall off of the gurney, failed to secure her oral airway, and made multiple attempts at intubation, ending with the endotracheal tube in her esophagus instead of her trachea, although the paramedics failed to realize that the tube was not properly placed. *Id.* The Court ultimately determined that there was no evidence that some of the medical errors would have made any difference to the causation of the decedent's injuries, and those errors which may have contributed to her injuries "would not amount to willful and wanton misconduct without circumstances of aggravation." *Id.* at 628-29.

Thus, Illinois cases addressing immunity of providers of emergency medical services appear to be in accord with North Carolina's law regarding gross negligence in other factual contexts, where

the difference between . . . [ordinary negligence and gross negligence] is not in degree or magnitude of inadvertence or carelessness, but rather is intentional wrongdoing or deliberate misconduct affecting the safety of others. An act or conduct rises to the level of gross negligence when the act is done purposely and with knowledge that such act is a breach of duty to others, i.e., a conscious disregard of the safety of others. An act or conduct moves beyond the realm of negligence when the injury or damage itself is intentional.

*Yancey,* 354 N.C. at 53, 550 S.E.2d at 158.

There is no doubt that the acts or omissions of defendants which resulted in plaintiff's being erroneously declared dead and thus denied attempts at resuscitation could be characterized as "inadvertence or carelessness" of a very high "degree or magnitude[,]" but plaintiff has not forecast evidence of "intentional wrongdoing or deliberate misconduct[,]" or what the Seventh Circuit referred to as "circumstances of aggravation." *Id; Fagocki,* 496 F.3d at 628. In each of the Illinois cases discussed which found that claims of "willful and wanton" conduct had been stated, the courts stressed the knowledge of the emergency personnel and their actions which were not in accord with that knowledge: knowledge that a person was suffering a potentially fatal asthma attack but failing even to attempt to open an

unlocked door; knowledge that a person was unsecured on a stretcher with unstable legs placed on a pothole and leaving the person unattended despite this knowledge; knowledge that a person was having an allergic reaction and difficulty breathing but still waiting seven to eight minutes to administer medication. *Fagocki*, 496 F.3d at 627-28. Here, the problem was defendants' lack of knowledge: they did not know that plaintiff was alive. Even if their lack of knowledge was caused by a negligent failure to conduct a sufficiently thorough examination to establish whether plaintiff was living or deceased, this is still ordinary negligence. *See Yancey*, 354 N.C. at 53, 550 S.E.2d at 158. Plaintiff has not forecast any "intentional wrongdoing or deliberate misconduct" as to these defendants. *Id.*

**[2]** Another issue raised on appeal is whether the trial court properly struck various affidavits filed by plaintiff. We conclude that the trial court did not err, as these affidavits sought to present evidence of the legal conclusion that defendants were "gross[ly] negligen[t] or engaged in "wanton conduct or intentional wrongdoing[.] *See* N.C. Gen. Stat. § 90-21.14. It would be improper for a jury to hear expert testimony

> as to whether a certain legal standard has been met.
>
>> The rule that an expert may not testify that such a particular legal conclusion or standard has or has not been met remains unchanged by the new Evidence Code, at least where the standard is a legal term of art which carries a specific legal meaning not readily apparent to the witness.
>
> Opinion testimony may be received regarding the underlying factual premise, which the fact finder must consider in determining the legal conclusion to be drawn therefrom, but may not be offered as to whether the legal conclusion should be drawn.

*Norris v. Zambito*, 135 N.C. App. 288, 292, 520 S.E.2d 113, 115-16 (1999) (citations omitted) (determining that "[w]hether the officers' conduct in pursuing Zambito was "grossly negligent" or "showed reckless disregard for the safety of others" are legal conclusions to be drawn from the evidence; Mr. Gormley's opinion testimony drawing such conclusions was, therefore, properly excluded" (citation omitted)). Much of the information contained in the excluded affidavits could properly be considered as to the issues of the standards of care applicable to each defendant and how defendants failed to meet those standards, but to the extent that any affiant states a legal conclusion, the affidavits were properly excluded. *See id.*

But even if we were to consider the affidavits, they did not present any new information as to the "underlying factual premise" or any facts to support a forecast of gross negligence. *Id.* at 292, 520 S.E.2d at 116. These affidavits review the facts, as summarized above, and review the applicable standards of care, stating how various defendants failed to comply with the applicable standards of care. In this regard, the affidavits would support claims for ordinary medical negligence. But the affidavits fail to identify any factors which would elevate the actions of defendants to gross negligence. Although the affidavits make generous use of phrases such as "conscious and reckless disregard for the rights and safety of Mr. Green[,]" the factual bases for these averments are simply the failures of defendants to comply with the applicable standards of care, which are, without more, still ordinary negligence, despite the adjectives an affiant may have used in stating the opinion.

We also note that this Court considered in *Green I* whether Dr. Perdue's actions as alleged by plaintiffs' complaint rose beyond a claim of ordinary negligence. *Green*, ___ N.C. App. at ___, 690 S.E.2d at 765. Although some of the legal issues raised in the prior case were different from those raised in this appeal, some were essentially the same. *See id.*, ___ N.C. App. ___, 690 S.E.2d 755. This Court addressed plaintiffs' claims against Dr. Perdue in his individual capacity, "alleg[ing] that his actions were in bad faith, or willful, wanton, corrupt, malicious or recklessly indifferent, and that Perdue acted outside the scope of his duties as a public officer." *Id.* at ___, 690 S.E.2d at 765 (quotation marks and brackets omitted). This Court noted:

A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another. An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.

*Id.* (citations and quotation marks omitted).

The specific acts which plaintiffs alleged "were perpetrated outside and beyond Perdue's duties and authority" were the following:

a. failing to determine if he was dealing with someone who was dead prior to beginning a forensic examination of that person;

b. failing, upon three separate and specific inquiries, to determine if Green was dead or alive at the scene;

c. directing that Green be removed from the scene to the morgue when Green was not in fact dead;

d. attempting to determine the cause of death of someone who was not dead;

e. disregarding evidence of breathing while examining Green's exposed chest;

f. concluding that the twitching in Green's right upper eyelid was because of muscle spasms "like a frog leg lumping in a frying pan" when Green was in fact alive;

g. holding on to his erroneous conclusion that Green was dead when questioned whether Green was alive after he, himself, and others observed Green's right eyelid twitch several times;

h. dissuading the paramedics and first responders from checking or rechecking Green for vital signs or otherwise reevaluating Green's condition;

i. handling Green as if he were a corpse when Green was, in fact, alive; and

j. failing to provide any medical treatment.

*Id.* We note that the essence of the allegations is the same as the allegations against defendants in this appeal: they failed to determine that plaintiff was alive and thus failed to provide any medical treatment because they believed he was dead.

This Court determined that

> the allegations establish that Perdue acted under the assumption that Green was deceased and that he disregarded signs that Green was still alive; however, we find that these allegations do not support plaintiffs' assertion that Perdue's actions were in bad faith, or willful, wanton, corrupt, malicious or recklessly indifferent.

*Id.* (quotation marks, ellipses, and brackets omitted). Although there are some differences between the legal duties of defendants herein and Dr. Perdue and some factual differences as to when and how each defendant encountered plaintiff, the similarities between this case and Dr. Perdue's case far outweigh any differences. *See id.*, ___ N.C. App. ___, 690 S.E.2d 755. Thus, we too conclude that plaintiff's forecast of evidence fails to demonstrate that defendants acts or

omissions rose to a level beyond ordinary negligence. The trial court properly granted summary judgment in favor of the defendants pursuant to N.C. Gen. Stat. § 90-21.14. This argument is overruled.

III. Conclusion

As we have concluded that the trial court properly granted defendants' motions for summary judgment, we need not address plaintiff's other issue on appeal regarding the taxing of costs against plaintiffs as this argument was based upon plaintiff's argument that he should have prevailed on the summary judgment motions.

AFFIRMED.

Judges GEER and THIGPEN concur.