CHARLES M. ERTHAL, DELORES ERTHAL, JEROME A. BUDDE, JR., AND ILENA T. BUDDE, PLAINTIFFS, v. FREDERICK B. MAY AND FRANCINE L. APPEL, A/K/A FRANCINE L. MAY, DEFENDANTS

No. COA12-603

(Filed 20 November 2012)

**1. Deeds—restrictive covenants—commercial use of land**

The trial court erred by granting summary judgment in favor of plaintiffs in an action seeking an injunction preventing defendants from making any commercial use of their land to board horses. The case was remanded for entry of summary judgment in favor of defendants and to dismiss plaintiffs' claims. Construing all of the relevant restrictive covenants together, they

---

did not prohibit commercial boarding and care of horses so long as this was done in conjunction with the single family residential use of the lot.

## 2. Abuse of Process—counterclaim—punitive damages

The dismissal of defendants' counterclaims for abuse of process and punitive damages was affirmed. The mere filing of a civil action with an ulterior motive was not sufficient to sustain a claim for abuse of process.

Judge BEASLEY concurring in separate opinion.

Appeal by defendants from order entered 12 December 2011 by Judge Gary M. Gavenus in Superior Court, Polk County. Heard in the Court of Appeals 10 October 2012.

*Prince, Youngblood & Massagee, PLLC, by Sharon B. Alexander, for plaintiffs-appellees.*

*Law Offices of Travis S. Greene, PC, by Travis S. Greene, for defendants-appellants.*

STROUD, Judge.

The parties to this case are all homeowners in the Stirrup Downs development, an equestrian community. Charles M. Erthal, Delores Erthal, Jerome A. Budde, Jr., and Ilena T. Budde ("plaintiffs") brought this action seeking an injunction preventing Fredrick B. May and Francine L. Appel, a/k/a Francine L. May ("defendants") from making any commercial use of their land to board horses at their operation known as Serenity Acres. The trial court granted summary judgment allowing the injunction, and defendants appeal. For the following reasons, we reverse in part and remand for entry of summary judgment in favor of defendants, dismissing the plaintiffs' claims, and we affirm in part, as to the dismissal of defendants' counterclaims.

## I. Procedural History

On or about 29 March 2010, plaintiffs filed the original complaint.[1] On 9 June 2010, defendants filed their answer to plaintiffs' original complaint, denying plaintiffs' allegations and raising several affirmative defenses, a motion to dismiss, and counterclaims for abuse of

---

1. The original complaint is not included in the record on appeal.

process and punitive damages. On 25 June 2010, plaintiffs were permitted to file an amended complaint against defendants requesting an injunction based on allegations that defendants were operating a "commercial enterprise" known as "Serenity Acres" in violation of the restrictive covenants of their subdivision. Plaintiffs alleged that at "Serenity Acres" the defendants provide "various and multiple commercial services, including but not limited to sales, events, instruction, riding lessons, horse boarding facilities, and horse training." On 9 July 2010, defendants filed their answer to plaintiffs' amended complaint, denying plaintiffs' allegations, raising several affirmative defenses, a motion to dismiss, and incorporating by reference the counterclaims for abuse of process and punitive damages as stated in their original answer. On 3 August 2010, plaintiffs filed a motion to dismiss defendants' counterclaims and their reply to those counterclaims. On 28 October 2011, defendants filed a motion to amend their answer to the amended complaint. On the same date, defendants filed a motion for partial summary judgment, with supporting documentation, "based upon the defenses set forth by the Defendants." On 3, 4, and 15 November 2011, plaintiffs filed affidavits in opposition to defendants' motion. On 6 December 2011, the trial court denied defendants' motion to amend their answer. Following a hearing, the trial court entered an order on 12 December 2011, denying defendants' motion for partial summary judgment. Instead, the trial court granted summary judgment in favor of plaintiffs as to defendants' counterclaims and affirmative defenses; granted summary judgment in favor of plaintiffs as to their request for an injunction; and "order[ed] the Defendants to cease all commercial activities and commercial use of Lot C of Stirrup Downs Subdivision." On 10 January 2012, defendants filed written notice of appeal from the trial court's 12 December 2011 order. On appeal, defendants contend that (1) the trial court erred in denying their motion for partial summary judgment based on their affirmative defenses and (2) the trial court erred in granting summary judgment as to defendants' counterclaims and plaintiffs' claim for injunctive relief.

## II. Factual Background

In 1989 Sardonyx Investments, Inc. began a real estate development in Polk County, North Carolina. On or about 20 September 1992, Sardonyx filed "Declarations of Restrictions" creating the Stirrup Downs subdivision which consisted of six lots (A-F), totaling

approximately 110 acres.[2] The restrictions for Stirrup Downs include the following pertinent provisions:

1.  Each lot shall be used for residential purposes only.

. . .

2.  There shall be constructed on each lot only one (1) primary single family dwelling, together with accessory buildings and one (1) guest house.

. . . .

9.  No illegal, noxious, or offensive activity shall be permitted, on any part of said land, nor shall anything be permitted nor done thereon which is or may become a nuisance or a source of embarrassment, discomfort or annoyance to the neighborhood. No trash, garbage, rubbish, debris, waste material, or other refuse shall be deposited or allowed to accumulate or remain on any part of said land.

. . . .

13. The Developer expressly intends to permit the pasturing of horses upon the various lots. However, such pasturing of horses shall be limited to reasonable use of the land. Because horses are permitted, the phrase "customary out-buildings" is expressed [sic] defined to include storage facilities, barns and stables.

The restrictions do not include any specific prohibition of commercial or business use of the lots.

On or about 12 January 1993, defendants purchased Lot C in the Stirrup Downs subdivision. Plaintiffs Charles and Delores Erthal purchased Lot B in Stirrup Downs on or about 14 February 1994, but did not began residing there until 1996. On or about 11 August 1997, plaintiffs Jerome and Ilena Budde purchased Lot D in Stirrup Down but did not began residing there until 2000. Shortly after moving into their residence in 1993, defendants begin to board horses for other owners, ultimately expanding this operation by constructing a barn and progressively adding multiple stables to accommodate boarded horses;

---

2. It appears to be undisputed that Stirrup Downs is an equestrian community; in fact, this Court has previously noted that the fact that "horses are specifically allowed by the Restrictive Covenants, and the presence of horses would make the community 'equestrian.'" *Steiner v. Windrow Estates Home Owners Ass'n, Inc.* ___ N.C. App. ___, ___, 713 S.E.2d 518, 526 (2011).

they also expanded their pastures and built a hay storage area and a riding arena. The defendants' operation is known as "Serenity Acres."

The name Serenity Acres is somewhat ironic, as serenity has not been the order of the day for the legal affairs within Stirrup Downs. On 22 July 2004, Gilbert and Dorothy Stanley, owners of lot E in the Stirrup Downs subdivision, filed a complaint against the Stirrup Downs Landowners Association, and the other owners of lots in Stirrup Downs, including plaintiffs Charles and Delores Erthal and Jerome and Ilena Budde, and defendants Frederick and Francine May. This complaint made the following specific allegations:

29. That the owner of Lot C is operating an active horse boarding, training, sales and dressage and eventing lesson business, known locally as "Serenity Acres" with public advertisement through both the Tryon Daily Bulletin and the internet.

30. Said horse boarding business is in violation of the restrictions limiting the use of the property for residential purposes only.

31. That as a direct result of the operation of said commercial business, there is excessive vehicular traffic, including truck and trailer traffic, on the road.

In their answer to this complaint, plaintiffs and defendants herein, all defendants in the Stanley lawsuit, denied these allegations. The Stanley lawsuit was ultimately settled by a consent judgment in 2005. After the settlement, Defendants continued to operate Serenity Acres, continued to advertise in local publications for horse boarding services, and made various improvements to their operation. From the affidavits and depositions filed in this case, it is clear that Defendants do board, breed, sell, and care for horses at Serenity Acres and that they receive financial remuneration for these services, although the exact number of horses has varied over time as boarders come and go and with the births, sales, and deaths of horses; it appears that there have never been more than ten horses, whether owned by defendants or boarded, at Serenity Acres at any one time.

III. Standard of review

In appeals from a trial court's ruling from a party's motion for summary judgment

[t]his Court's standard of review is *de novo*, and we view the evidence in the light most favorable to the non-movant. The standard of review for an order granting a motion for summary judgment

requires a two-part analysis of whether, (1) the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact; and (2) the moving party is entitled to judgment as a matter of law.

*Green v. Kearney*, ___ N.C. App. ___, ___, 719 S.E.2d 137, 140 (2011) (quoting *Honeycutt v. Honeycutt*, ___ N.C. App. ___, ___, 701 S.E.2d 689, 694 (2010)) (citations and quotation marks omitted). "Summary judgment is appropriate if: (1) the non-moving party does not have a factual basis for each essential element of its claim; (2) the facts are not disputed and only a question of law remains; or (3) if the non-moving party is unable to overcome an affirmative defense offered by the moving party." *Griffith v. Glen Wood Co.*, 184 N.C. App. 206, 210, 646 S.E.2d 550, 554 (2007) (citation, footnote, and quotation marks omitted).

Interpretation of the language of a restrictive covenant is a question of law reviewed *de novo*. *See Moss Creek Homeowners Ass'n v. Bissette*, 202 N.C. App. 222, 228, 689 S.E.2d 180, 184 (observing that "restrictive covenants are contractual in nature." (citation omitted)), *disc. rev. denied*, 364 N.C. 242, 698 S.E.2d 402 (2010); *Harris v. Ray Johnson Const. Co., Inc.*, 139 N.C. App. 827, 829, 534 S.E.2d 653, 654 (2000) (stating that contract interpretation is a matter of law, reviewed *de novo*).

### III. Summary Judgment

#### A. Defendants' affirmative defenses

Defendants argue that the trial court erred in denying their motion for partial summary judgment as the forecast of evidence established all of their pled affirmative defenses including laches, consent, estoppel, waiver, license, unclean hands, balance of the hardships, and ambiguity of the restrictive covenants. Plaintiffs counter that "the trial court did not err in denying [defendants'] motion for partial summary judgment on their affirmative defenses and granting [their] motion for summary judgment on all such defenses."

Defendants have raised many affirmative defenses, the most compelling of which is judicial estoppel, based upon the fact that plaintiffs herein were co-defendants in the prior Stanley lawsuit, in which plaintiffs took the position that Serenity Acres was not in violation of

the restrictive covenants.[3] But even if plaintiffs were judicially estopped from claiming that defendants' operation of Serenity Acres is in violation of the restrictive covenants based upon activities as they were conducted up to the time of settlement of the Stanley lawsuit in 2005, plaintiffs also claim that defendants have increased and expanded the activities of Serenity Acres after 2005.[4] So even if we were to assume that plaintiffs are judicially estopped from bringing this claim based upon the scope of activities up to 2005, plaintiffs argue that the defendants' activities have changed and are thus now in violation of the restrictive covenants, even if they were not in 2005. So instead of addressing each of defendants' affirmative defenses, we will address instead the heart of the matter, which is the interpretation of the covenants, as this issue is dispositive.

B. Interpretation of restrictive covenants

**[1]** This Court has previously summarized the principles which guide our consideration of restrictive covenants as follows:

> [J]udicial enforcement of a restrictive covenant is appropriate at the summary judgment stage unless a material issue of fact exists as to the validity of the contract, the effect of the covenant on the unimpaired enjoyment of the estate, or the existence of a provision that is contrary to the public interest.

> We also note that[] . . . while the intentions of the parties to restrictive covenants ordinarily control the construction of the covenants, such covenants are not favored by the law, and they will be strictly construed to the end that all ambiguities will be resolved in favor of the unrestrained use of land. The rule of strict construction is grounded in sound considerations of public policy: It is in the best interests of society that the free and unrestricted use and enjoyment of land be encouraged to its fullest extent.

---

3. "[J]udicial estoppel forbids a party from asserting a legal position inconsistent with one taken earlier in the same or related litigation." *Price v. Price,* 169 N.C. App. 187, 191, 609 S.E.2d 450, 452 (2005) (quotation marks omitted).

4. The extent of any increase is not clear, as Plaintiffs actually produced the responses of Defendants May and Appel in the Stanley lawsuit as a part of their response to Defendants' First Set of Interrogatories and Request for Production of Documents. In the responses in the Stanley lawsuit, May and Appel set forth the number of horses boarded (6, 2 owned by defendants) and the amounts of horse feed and hay used as well as identification of veterinarians and farriers who had performed services at Serenity Acres. It appears from depositions that defendants may have had up to ten horses at Serenity Acres at times.

The law looks with disfavor upon covenants restricting the free use of property. As a consequence, the law declares that nothing can be read into a restrictive covenant enlarging its meaning beyond what its language plainly and unmistakably imports.

Covenants restricting the use of property are to be strictly construed against limitation on use, and will not be enforced unless clear and unambiguous. This is in accord with general principles of contract law, that the terms of a contract must be sufficiently definite that a court can enforce them. Accordingly, courts will not enforce restrictive covenants that are so vague that they do not provide guidance to the court.

*Wein II, LLC v. Porter*, 198 N.C. App. 472, 479-80, 683 S.E.2d 707, 712-13 (2009) (quotation marks, citations, and brackets omitted).

Defendants argue that "[r]estrictive covenants one (1) and thirteen (13) create an ambiguity of the degree that enforcement against the defendants would be inequitable." As noted above, covenant 1 restricts use of the lots to "residential purposes only," while covenant 13 expressly allows "pasturing of horses upon the various lots" as well as construction of "storage facilities, barns and stables."[5] Based upon the dictionary definitions of the relevant words, Defendants contend that "residential purposes" and pasturing of horses are two different uses, noting that

it is clear that there is no correlation between the terms "residential" and "pasturing." While restrictive covenant one purports to restrict lots to use for residential purposes only, the allowance for the pasturing of horses found in restrictive covenant thirteen stands in direct contradiction to residential use. The pasturing of horses would best be described as an agricultural use and not a residential use. "Agriculture" is defined as "the science, art, or occupation concerning the cultivating of land, raising of crops, and feeding, breeding, and raising livestock; farming." Random House Webster's College Dictionary 28 (Robert B. Costello et al. eds., 1991).

Defendants also note that "the term "commercial" does not appear in the original restrictions or the Amended Declaration of Restrictions and argue that

---

5. Although the phrase "customary outbuildings" is defined in covenant 13, it does not appear elsewhere in the restrictive covenants. But covenant 1 does permit "accessory buildings" to be constructed in addition to the one "single family dwelling," so the only logical interpretation of the covenants is that the "customary outbuildings" defined in covenant 13 and the "accessory buildings" noted in covenant 1 are the same thing under these covenants.

[i]f the developer and the parties to the Amended Declaration of Restrictions had intended to prohibit any "commercial" aspects to the pasturing of horses, that intention could have been clearly expressed. Instead, the parties are left with contradictory and ambiguous restrictions. "This Court may not restrict the use of the property when the restrictive covenant has failed to do so in a clear manner." *Winding Ridge Homeowners Ass'n, Inc. v. Joffe,* 184 N.C. App. 629, 641, 646 S.E.2d 801, 809 (2007).

Plaintiffs claim that the covenants are "plain and unambiguous", arguing that

The plain meaning and usage of the term "pasturing" is unambiguous. It means "to feed on growing grass or herbage: GRAZE." Webster's Third New International Dictionary, G. & C. Merriam Co., 1981. Appellants acknowledge that boarding involves more than pasturing, such as cleaning stalls, feeding, turning out, blanketing, bandaging, grooming, and arranging veterinarian and farrier visits. (App. p. 3; Fran May Dep. Vol. I at pp. 137, 217-218) Notably, Appellants attempted to amend the Declaration to add and include boarding as a permitted use. (Fred May Dep., pl. Ex. 91) There is no inherent conflict between the terms "residential" and "pasturing" since residential owners may peacefully allow their own horses to graze on private pasture without engaging in a commercial business, and that was exactly the developer's intent. A conflict only arises between "residential" and "pasturing" under Appellants' strained and unreasonable interpretation of "pasturing" to include commercial boarding.

Plaintiffs ask that we look only to the word "pasturing" to determine the meaning of the covenants, as they attempt to extrapolate a prohibition on "commercial" pasturing (as opposed to "private" pasturing) from the word "pasturing", but we are required instead to examine and interpret the covenants in their entirety. *See Lynn v. Lynn,* 202 N.C. App. 423, 435, 689 S.E.2d 198, 207 (2010) (stating that a "contract must be considered as an entirety." (quotation marks and citation omitted)), *disc. rev. denied,* 364 N.C. 613, 705 S.E.2d 736.

The trial court focused upon plaintiffs' claim that "commercial" use of the lots was prohibited, and in fact the trial court's order required "Defendants to cease all commercial activities and commercial use of Lot C of Stirrup Downs Subdivision." Yet the covenants contain absolutely no prohibition of business or commercial use of the lots; any restriction upon commercial or business use can only be

inferred from the covenants. Plaintiffs attempt to find this restriction by looking only to the definition of "pasturing," but this argument ignores the other pertinent provisions of the covenants. There is no dispute that the covenants allow the boarding and pasturing of horses on the lots—plaintiffs do not contend that horses owned by the parties must be stabled and cared for elsewhere but only put out to graze on the lots. The covenants expressly allow construction of "storage facilities, barns and stables," thus allowing owners to construct buildings needed to stable the horses and to store their provisions.

Read in the context of covenant 13, it is apparent that these buildings are related to the boarding and care of horses. The ordinary meanings of these words are clear. A "stable" is defined as "a building in which domestic animals are sheltered and fed; [especially]: such a building having stalls or compartments <a horse [stable]>." Merriam Webster's Collegiate Dictionary 1213 (11th ed. 2003). A "barn" is "a [usually] large building for the storage of farm products or feed and [usually] for the housing of farm animals or farm equipment." *Id.* at 99.

There is no restriction upon the number or size of "storage facilities, barns and stables" which may be constructed on each lot, although each lot is limited to only "one (1) primary single family dwelling" and "one (1) guest house." Contrary to plaintiffs' argument, there is no indication in the covenants that any other activities related to caring for horses, such as "cleaning stalls, feeding, turning out, blanketing, bandaging, grooming, and arranging veterinarian and farrier visits" are somehow prohibited; in fact, plaintiffs acknowledge in their responses to discovery that they also care for their own horses in the same manner as defendants. Whether horses are kept for personal use or as paying boarders, all horses need these types of care.

We believe that all of the covenants can be given effect with "fair and reasonable intendment." *Belverd v. Miles*, 153 N.C. App. 169, 174, 568 S.E.2d 874, 877 (quotation marks and citation omitted), *disc. rev. denied*, 356 N.C. 610, 574 S.E.2d 466.(2002). Construing all of the relevant restrictive covenants together, we hold that they do not prohibit commercial boarding and care of horses in Stirrup Downs so long as this is done in conjunction with the single family residential use of the lot. Our interpretation of these covenants is guided by *Belverd v. Miles*, 153 N.C. App. 169, 568 S.E.2d 874 (2002) and *Bumgarner & Bowman Bldg., Inc. v. Hollar*, 7 N.C. App. 14, 171 S.E.2d 60 (1969). In both cases, one provision of the covenants standing alone was susceptible to one interpretation, but another provision of the covenants created an apparent conflict or ambiguity. *Belverd,*

153 N.C. App. at 173-74, 568 S.E.2d at 876-77; *Bumgarner & Bowman Bldg., Inc.*, 7 N.C. App. at 17-18; 171 S.E.2d at 61-62. In both cases, the court examined the covenants in their entirety in seeking to reconcile them, and to the extent that the covenants were still ambiguous when "when considered together . . . resolve[d] these doubts in favor of the defendants." *Bumgarner & Bowman Bldg., Inc.*, 7 N.C. App. at 18, 171 S.E.2d at 62; *see Belverd*, 153 N.C. App. at 174, 568 S.E.2d at 877 (construing covenants together in light of the preference for free use of property).

Here, we note that these covenants lack a provision all other reported cases (other than *J.T. Hobby & Sons, Inc. v. Family Homes*, 302 N.C. 64, 71, 274 S.E.2d 174, 179 (1981), as discussed below) which we have been able to find dealing with restrictions of "residential use" have had: there is no mention of a restriction on commercial or business use of the property. Often these restrictions appear together. But residential use means simply that "the property is used for the habitation of human beings and for those activities such as eating, sleeping, and engaging in recreation which are normally incident thereto" *J.T. Hobby & Sons, Inc. v. Family Homes*, 302 N.C. at 71, 274 S.E.2d at 179. There is no dispute that the defendants do use Lot C for their personal residence, although Serenity Acres is also on Lot C. While the lots are restricted to residential use "only," the covenants also clearly allow horses to be kept on the lots, and there is no restriction as to the number of horses or buildings needed for their shelter and care.

Plaintiffs' arguments focus quite narrowly upon their claim that the covenants prohibit a *commercial* use of the lots; in other words, defendants' activities at Serenity Acres would be acceptable to plaintiffs if only defendants did not receive any financial remuneration for them. Based upon their arguments, it appears that plaintiffs would have no objection to the defendants' boarding, riding, pasturing, and maintaining any number of horses, so long as defendants were not paid for these activities.[6] But our Supreme Court has previously noted that determining "the nature of the usage of the property at issue does not turn upon the economic basis upon which the property is supported. That basis does not detract from the primary objective behind the operation of the facility and the essence of that operation." *J.T. Hobby & Sons, Inc.*, 302 N.C. at 72-73, 274 S.E.2d at 180.

---

6. Plaintiffs Budde keep and care for three horses on their lot; plaintiffs Erthal have four. All of the parties have stables for their horses; Plaintiffs Erthal also have a riding ring.

In *Hobby*, the court noted that the "issue turns upon our construction of two phrases contained in the restrictive covenant upon which plaintiffs rely: 'residential purpose' and 'single-family dwelling' " *Id.* at 70, 274 S.E.2d at 179. The plaintiffs sought to prevent the defendant from using a dwelling for purposes of a family care home for mentally retarded adults, claiming that the family care home was not a "single family dwelling" with a "residential purpose." *Id.* at 68-69, 274 S.E.2d at 177-78. The Supreme Court agreed with the defendants that the "residential usage requirement is satisfied if the property is used for the habitation of human beings and for those activities such as eating, sleeping, and engaging in recreation which are normally incident thereto" and held that the fact "that defendant is compensated for the services it renders does not render its activities at the home commercial in nature." *Id.* at 71, 73, 274 S.E.2d at 179-80. The court noted that "[w]hile it is obvious that the home would not exist if it were not for monetary support being provided from some source, that support clearly is not the objective behind the operation of this facility." *Id.* at 73, 274 S.E.2d at 180. The *Hobby* court was not considering a restriction of commercial use, but instead a definition of "residential purpose", *see id.* at 68-69, 274 S.E.2d at 177-78, just as we are here, since the covenants do not include a commercial use restriction.

It is instructive that the Supreme Court looked to the "objective behind the operation" of the facility and did not consider the fact of "monetary support" for the home dispositive. *See id.* at 71-73, 274 S.E.2d at 179-80. Here, the covenants allow the "objective" of keeping and caring for horses, by allowing any reasonable number of horses to be pastured and by allowing construction of any number of barns, stables, and storage.[7] Whether or not the owner of the lot maintains the operation for his own personal enjoyment or for a commercial purpose does not change the nature of the use, where the covenants contain no restriction on business or commercial use of the lots.

Covenant 9 does not change our analysis of the covenants in their entirety. Although plaintiffs do not expressly allege a violation of covenant 9 in their complaint, they do allege that the "commercial business owned by the Defendants" creates "excessive traffic on the private road . . . causing additional noise and wear and tear of the

---

7. The covenant does limit the pasturing to "reasonable use of the land," but plaintiffs have not argued that defendants have pastured horses in an unreasonable manner on Lot C, so we will not attempt to discern what "reasonable" pasturing use might be, although we would imagine that there is a point at which the number of horses, or the manner in which they are kept and used, would be unreasonable.

ERTHAL v. MAY

[223 N.C. App. 373 (2012)]

road." As there is no provision in the covenants which addresses use of the roads or noise, covenant 9 is the only provision which might conceivably forbid activities which create "excessive traffic" or noise. In answers to interrogatories, plaintiffs also complain about excessive and annoying noise: "canines" barking when "strangers [are] coming and going;" "the hammering of metal on metal" by the farriers which "appears to sound louder than normal and is more annoying, especially at dinner time;" defendants' boarders who "chatter loudly" and ride outside the boundaries of the CETA trails on the plaintiffs' lots.[8]

In pertinent part, covenant 9 provides that "no illegal, noxious, or offensive activity shall be permitted, on any part of said land, nor shall anything be permitted nor done thereon which is or may become a nuisance or a source of embarrassment, discomfort or annoyance to the neighborhood." This Court has recently held an almost identical provision to be void for vagueness.

> [T]here is little case law addressing the question of what language in a restrictive covenant is void for vagueness, and what language is not. It appears that we have not dealt with this void for vagueness question because our courts usually supply a definition for an undefined term in a covenant rather than void the entire covenant. Unless the covenants set out a specialized meaning, the language of a restrictive covenant is interpreted by using its ordinary meaning. We are thus left to consider the "ordinary meaning" of the words used by paragraph 6.

> Here, paragraph 6 of the Restrictive Covenants focuses on the subjective emotions or feelings of 'embarrassment, discomfort, annoyance, or nuisance' experienced by 'the neighborhood.' The definition of things or activities proscribed by paragraph 6 of the Restrictive Covenants is expanded to cover that which 'is in any way noxious, dangerous, unsightly, unpleasant or of a nature as may diminish or destroy the enjoyment of other property in the neighborhood by the owners thereof.' We do not think it necessary here to cite specific dictionary definitions of the operative words: embarrassment, discomfort, annoyance, nuisance, noxious, unsightly, and unpleasant; each of these words describes a subjective and personal experience or feeling. Just as beauty is in

8. Plaintiffs are part of the Collinsville Equestrian Trails Association (CETA) "which provides fellow landowners with trails owned by them a place to ride our horses." Plaintiffs agreed to "allow horses on certain trails on [their] property but they are not deeded easements."

the eye of the beholder, each of these terms can be defined only from the perspective of the beholder. See generally Coates v. Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed. 2d 214, 217 (1971) ("Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, men of common intelligence must necessarily guess at its meaning." (citation and quotation marks omitted)).

*Steiner*, ___ N.C. App. at ___, 713 S.E.2d at 527 (quotation marks and other citation omitted).

Overall, plaintiffs claim that defendants' boarders are "annoying" because they create additional noise and traffic, both equine and motor vehicle, in and out of Stirrup Downs. In *Steiner*, we determined that although the plaintiffs considered the defendant's two Nigerian dwarf goats, Fred and Barney, to be "annoying, noxious, and unpleasant [while the] plaintiffs consider[ed] them adorable and lovable[,] [t]he Restrictive Covenants as written do not provide sufficient guidance or definitions to permit the Board, or a court, to make any sort of objective determination of who is right, and this is the essence of vagueness." *Id.* Just as in *Steiner*, the restrictive covenants do not have "sufficient guidance or definitions" that a court can make an objective determination, so covenant 9 is too vague to provide any additional limitation upon the parameters of keeping horses in Stirrup Downs. The trial court therefore erred in granting summary judgment in favor of plaintiffs and instead should have granted summary judgment in favor of defendants.

C. Defendants' counterclaims

[2] As we have determined that the trial court should have granted defendant's motion for summary judgment as to plaintiffs' claim, we must now address the portion of the trial court's order which grants summary judgment in plaintiffs' favor as to the defendants' counterclaims for abuse of process and punitive damages. The only argument defendants raise on appeal as to the trial court's granting of summary judgment in favor of plaintiffs and dismissing their counterclaims is that it was error for the trial court to make a ruling on their counterclaims or plaintiff's request for injunctive relief as their motion for summary judgment, the only motion before the trial court, was only "as to their affirmative defenses[.]" Defendants reason that the trial

court had no authority to allow summary judgment against them regarding their counterclaims and upon plaintiff's claim for injunctive relief because plaintiffs had not filed a motion for summary judgment and they were not given the required ten-day notice, which would have allowed them time to submit affidavits in support of their counterclaims. Plaintiffs counter that the Rules of Civil Procedure permit the trial court to grant summary judgment against the moving party.

"Rule 56 does not require that a party move for summary judgment in order to be entitled to it." *N.C. Coastal Motor Line, Inc. v. Everette Truck Line, Inc.*, 77 N.C. App. 149, 151, 334 S.E.2d 499, 501 (1985), *disc. review denied*, 315 N.C. 391, 338 S.E.2d 880 (1986). Thus, the trial court can grant summary judgment against the moving party. *Carricker v. Carricker*, 350 N.C. 71, 74, 511 S.E.2d 2, 5 (1999). Here, the issue is not whether the trial court could find against the movant, but whether the trial court could grant summary judgment on a counterclaim on which *no* party moved for summary judgment.

Our Supreme Court has previously held that even if the parties have only moved for partial summary judgment, it is not error for the trial court to grant summary judgment on all claims where both parties are given the opportunity to submit evidence on all claims before the trial court. *See A-S-P Associates v. City of Raleigh*, 298 N.C. 207, 212, 258 S.E.2d 444, 448 (1979) (holding that summary judgment on all claims was proper in that case because evidence was submitted on all claims, although the relevant motion only requested summary judgment as to some of the claims before the trial court).

The trial court had the power to enter summary judgment as to all of the claims before it, even though defendant only moved for partial summary judgment, as the parties submitted evidence addressing the counterclaims. Here, the depositions of the individual defendants were submitted, and defendant Francine May answered a series of questions regarding the counterclaim for abuse of process in her deposition. Thus, the parties had submitted evidence addressing both the plaintiffs' affirmative claims as well as the defendants' counterclaim.

We must next consider whether the defendants' forecast of evidence, viewed in a light most favorable to defendants, would support the counterclaim for abuse of process.

Abuse of process is the misuse of legal process for an ulterior purpose. It consists in the malicious misuse or misapplication of that process *after issuance* to accomplish some purpose not warranted or commanded by the writ. It is the malicious perversion

of a legally issued process whereby a result not lawfully or properly obtainable under it is attended [sic] to be secured. Abuse of process requires both an ulterior motive and an act in the use of the legal process not proper in the regular prosecution of the proceeding, and that both requirements relate to the defendant's purpose to achieve through the use of the process some end foreign to those it was designed to effect. The ulterior motive requirement is satisfied when the plaintiff alleges that the prior action was initiated by defendant or used by him to achieve a collateral purpose not within the normal scope of the process used. The act requirement is satisfied when the plaintiff alleges that once the prior proceeding was initiated, the defendant committed some willful act whereby he sought to use the existence of the proceeding to gain advantage of the plaintiff in respect to some collateral matter.

*Chidnese v. Chidnese*, ___ N.C. App. ___, ___, 708 S.E.2d 725, 734-35 (2011) (citations, quotation marks, and brackets omitted; emphasis in original).

Here, although defendant Francine May claimed in her deposition that defendants have been embarrassed by the present action, defendants failed to allege facts in their counterclaim or forecast evidence which might show any act taken with ulterior motive *after* the initiation of the present suit. Defendants only alleged that plaintiffs filed this action to gain control of the Stirrup Downs Landowners Association. We have made clear that "the mere filing of a civil action with an ulterior motive is not sufficient to sustain a claim for abuse of process." *Id.* at ___, 708 S.E.2d at 735. Thus, defendants have failed to state a claim for abuse of process.

Further, defendants' punitive damages counterclaim are based entirely on their abuse of process claim. To recover for punitive damages, the party seeking such damages must first establish that they have suffered some legal wrong. *Hawkins v. Hawkins*, 331 N.C. 743, 745, 417 S.E.2d 447, 449 (1992). Having held that defendants failed to properly state a claim for abuse of process, we must conclude that defendants also cannot sustain their punitive damages claim.

"[S]ummary judgment may be entered against a party if the non-movant fails to allege or forecast evidence supporting all the elements of his claim." *One Beacon Ins. Co. v. United Mechanical Corp.*, 207 N.C. App. 483, 485, 700 S.E.2d 121, 123 (2010). Because defendants failed to show any act by the plaintiffs after initiation of

the lawsuit and because defendant's demand for punitive damages relies solely on that claimed legal wrong, summary judgment was properly granted and we affirm the trial court's order as to those counterclaims.

## IV. Conclusion

For the foregoing reasons, we affirm the trial court's order granting summary judgment for plaintiffs as to defendants' counterclaims for abuse of process and punitive damages, but we reverse and remand for entry of summary judgment in favor of defendants as to plaintiffs' claims.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

Judge ELMORE concurs.

Judge BEASLEY concurs in a separate opinion.

BEASLEY, Judge concurring separately.

I agree with the majority that the trial court should not have granted summary judgment in favor of Plaintiffs, but I would reach this result on differing grounds. I would not find the restrictive covenants to be ambiguous; I would reverse and remand the case as I believe there is an issue of material fact regarding the defense of laches. I also would reverse the order granting Plaintiffs summary judgment on Defendants' counterclaims since the record is unclear as to whether Defendants had an "adequate opportunity" to show that there was a genuine issue of fact. Thus, I write separately.

First, I would hold that the restrictive covenants in this case are not ambiguous. I believe Covenants 1 and 13 can be construed according to their plain meanings and in a way that does not use strict construction in place of common sense.

"[R]estrictive covenants should not be so strictly construed 'as to defeat the purpose of the restriction.' " *Donaldson v. Shearin*, 142 N.C. App. 102, 106, 541 S.E.2d 777, 780 (2001)(quoting *Robinson v. Pacemaker Investment Co.*, 19 N.C. App. 590, 594, 200 S.E.2d 59, 61 (1973)). "In construing the language used in restrictive covenants, 'each part . . . must be given effect according to the natural meaning of the words.' A dictionary is an appropriate place to gather the natural meaning of words." *Agnoff Family Revocable Trust v. Landfall Assocs.*, 127 N.C. App. 743, 744, 493 S.E.2d 308, 309 (1997)(quoting

*J.T. Hobby & Sons, Inc. v. Family Homes*, 302 N.C. 64, 71, 274 S.E.2d 174, 179 (1981)).

The majority opinion points out that the covenants in this case do not mention a ban on commercial use. Though a covenant restricting use to residential purposes and a ban on commercial use may tend to go together, the case law cited by the majority does not attach any significance to the presence of a prohibition on commercial use in addition to the restriction for residential purposes. *See Belverd v. Miles*, 153 N.C. App. 169, 568 S.E.2d 874 (2002); *Bumgarner & Bowman Bldg., Inc. v. Hollar*, 7 N.C. App. 14, 171 S.E.2d 60 (1969). My reading of *Belverd* reveals that the restrictions in that case did not expressly prohibit commercial use but had merely restricted use to residential purposes. *Bleverd*, 153 N.C. App. at 173, 568 S.E.2d at 876.

This case can be contrasted with the conflicting covenants in *Belverd* and *Bumgarner*. In *Belverd*, Covenant 1 stated, "No lot shall be used for other than residential purposes. No residential dwelling shall be erected, placed or permitted to remain on any lot other than one single family dwelling[.]" *Id.* Covenant 13 stated,

> No lot shall be used for the purpose of constructing a public street or to provide access to and from the properties located in the subdivision of Partridge Bluff, Section One, to property surrounding Partridge Bluff, Section One, except with the written consent and permission of Allan D. Miles and wife, Wanda M. Miles, their heirs and assigns.

*Id.* This Court held that

> [n]either paragraph one nor paragraph thirteen is, on its own, ambiguous. However, in terms of whether a lot may be used for a through-street, paragraphs one and thirteen conflict with each other. Paragraph one would prohibit the use of a lot for a public through-street since such use is clearly not "residential". . . . Paragraph thirteen, on the other hand, would allow such use if the Mileses gave written consent.

*Id.* at 173-74, 568 S.E.2d at 876-77 (citations omitted). In *Bumgarner*, a restrictive covenant prohibited business use on any of the lots and prohibited all structures other than "one detached single family dwelling" on each lot. *Bumgarner*, 7 N.C. App. at 15, 171 S.E.2d at 60. Another restrictive covenant prohibited a "trailer, separate basement, tent, shack, garage or other outbuildings" from being used as a temporary or permanent residence. *Id.* The outbuildings provision was

susceptible to two interpretations: that the named buildings are permitted so long as they are not used as a residence, or that they are buildings that cannot be used as a "detached single family dwelling." *Id.* at 15-16, 171 S.E.2d at 60-61. This Court held that the two provisions when considered together were ambiguous. *Id.* at 17-18, 171 S.E.2d at 61-62. The essence of *Belverd* and *Bumgarner* is that if one restrictive covenant can reasonably be interpreted to allow an activity that another restrictive covenant would prohibit, the covenants are ambiguous.

I fail to see how the covenant allowing pasturing of horses allows an activity that is prohibited by the restriction on residential use. Common sense dictates that a restriction limiting use of the property to residential purposes thereby prohibits commercial use. Residential use is a use for "the habitation of human beings and for those activities such as eating, sleeping, and engaging in recreation which are normally incident thereto." *J.T. Hobby*, 302 N.C. at 71, 274 S.E.2d at 179. Commercial use would be a use other than residential use. Taking the Plaintiffs' asserted definition that the majority quotes, "pasture" means "to feed on growing grass or herbage." The plain dictionary definition of "pasture" creates no conflict with the restriction on residential use. I would interpret the covenant allowing pasturing of horses to mean that the definition of residential use includes pasturing of horses, not that the pasturing of horses potentially allows a commercial activity, which then conflicts with the restriction on residential use. Pasturing one's horse is a residential use given that the Supreme Court's definition of residential use includes recreation incident to human habitation. *Id.* The developer "expressly intend[ed] to permit the pasturing of horses" as part of the recreation in the area. It may have been implicit in the restriction on residential use that pasturing of horses was allowed, but the additional, explicit covenant allowing pasturing makes it clear.

The majority opinion also relies heavily on *J.T. Hobby* to say that the fact that Defendants accept remuneration in exchange for providing services for customers' horses that they would otherwise provide if the horses were their own makes no difference in determining whether the use is residential. I find that case to be distinguishable based on the activity involved and public policy. *J.T. Hobby* involved a developer's challenge to the proposed use for one of the lots as a group home for mentally handicapped individuals. *Id.* at 69, 274 S.E.2d at 178. Though not expressly discussed, public policy likely influenced the result in *J.T. Hobby* given that the use of the home pro-

vided a valuable service for a sector of the public that has historically faced discrimination. The activity in *J.T. Hobby* involved humans, whereas in the activity in this case involves horses. The defendants in *J.T. Hobby* also had a loftier goal than these Defendants, as the Supreme Court noted:

> That defendant is compensated for the services it renders does not render its activities at the home commercial in nature. While it is obvious that the home would not exist if it were not for monetary support being provided from some source, that support clearly is not the objective behind the operation of this facility. That defendant is paid for its efforts does not detract from the essential character of its program of non-institutional living for the retarded. Clearly, the receipt of money to support the care of more or less permanent residents is incidental to the scope of defendant's efforts. In no way can it be argued that a significant motivation behind the opening of the group home by defendant was its expectation of monetary benefits.

*Id.* at 73, 274 S.E.2d at 180. Defendants here have never claimed a higher purpose in their boarding of horses. Defendants operate Serenity Acres with the expectation of monetary benefits, specifically arguing in their brief that the trial court erred in granting Plaintiffs summary judgment based on the balance of hardships and the money they would lose. I would hold that the covenants are not ambiguous and that commercial activity is prohibited by the covenant restricting use to residential purposes.

Notwithstanding my disagreement with the majority's holding that the restrictions are ambiguous and thus invalid, the reversal of summary judgment in Plaintiffs' favor is correct. I would reverse and remand the case as I believe that an issue of material fact exists on the defense of laches, precluding summary judgment.

> To establish the affirmative defense of laches, our case law recognizes that 1) the doctrine applies where a delay of time has resulted in some change in the condition of the property or in the relations of the parties; 2) the delay necessary to constitute laches depends upon the facts and circumstances of each case; however, the mere passage of time is insufficient to support a finding of laches; 3) the delay must be shown to be unreasonable and must have worked to the disadvantage, injury or prejudice of the person seeking to invoke the doctrine of laches; and 4) the

defense of laches will only work as a bar when the claimant knew of the existence of the grounds for the claim.

*MMR Holdings, LLC v. City of Charlotte*, 148 N.C. App. 208, 209-10, 558 S.E.2d 197, 198 (2001).

Delores Erthal's affidavit indicates that the number of horses Defendants boarded fluctuated along with the traffic in and out in or after 1996 when she took riding lessons from Francine May that. Charles Erthal's affidavit indicates that he gradually became aware sometime after 1996 that Defendants were not boarding the horses on their property without remuneration. He noticed a fluctuation in traffic and the number of horses. In 2006, he and his wife noticed the number of horses increase as well as the traffic. Ilena Budde's amended affidavit states that she noticed the boarding as early as 1999. She knew that Defendants were boarding three horses in 2001. Jerome Budde's amended affidavit also indicates that Defendants informed him that they were boarding in 1999 when they saw a woman lead her horse off the property. Since 2000, the Buddes noticed that the number of horses and traffic has fluctuated, culminating in 2006 when they noticed that the number of horses and traffic had increased.

There is an issue of material fact as to when the Plaintiffs knew of the existence of the grounds for the claim. The Erthals may have been aware of commercial activity on Defendants' property as early as 1996 and the Buddes may have been aware of commercial activity on Defendants' property as early as 1999. On the other hand, the number of horses and traffic increased around 2006 according to Plaintiffs' affidavits, perhaps indicating that only then did they know of the grounds for their claim. If 2006 is when the Plaintiffs were aware of the existence of their claim, then this delay is not unreasonable considering the health problems that the Buddes experienced beginning in 2007 and considering that the Erthals did not want a neighbor to retaliate and bar them from using his riding trails. *See Williamson v. Pope*, 60 N.C. App. 539, 542-43, 299 S.E.2d 661, 663 (1983)(finding that plaintiff's delay of a few years in filing suit was not barred by laches when it was not due to neglect). If 1996 or 1999 is when the Plaintiffs were aware of the existence of their claim, then this delay is unreasonable since Defendants expended additional sums of money in furtherance of their business by adding stalls to their barn and clearing three acres of land after 1999. *See Farley v. Holler*, 185 N.C. App. 130, 132, 647 S.E.2d 675, 678 (2007)(finding

plaintiffs' case barred by laches when the "undisputed facts" showed that plaintiffs delayed nine years before filing suit, defendants spent $100,000 in the meantime, and the relations of the parties had changed). A genuine dispute exists regarding a material fact; thus, summary judgment was inappropriate on this defense.

I also disagree with the majority's holding regarding Defendants' counterclaims. *A-S-P Associates v. City of Raleigh*, 298 N.C. 207, 212, 258 S.E.2d 444, 448 (1979), upheld summary judgment for the defendant on all claims when the plaintiff had merely moved for partial summary judgment since the "moving party ha[d] been given adequate opportunity to show in opposition that there is a genuine issue of fact to be resolved." *Id.* Though not discussed in *A-S-P Associates*, Rule 56(c) of the North Carolina Rules of Civil Procedure requires ten days' notice for a motion for summary judgment. Even though summary judgment may appropriately be granted to the non-moving party, *N.C. Coastal Motor Line, Inc. v. Everette Truck Line, Inc.*, 77 N.C. App. 149, 151, 334 S.E.2d 499, 501 (1985), some degree of notice is required before the trial court can rule against a party on all claims when the moving party has, at most, requested partial summary judgment in his favor. *See Tri City Building Components v. Plyler Construction*, 70 N.C. App. 605, 607-08, 320 S.E.2d 418, 420 (1984) ("[W]ith adequate time to prepare for the summary judgment hearing, the issues can often be made clearer and the court's task easier. The defendant either by affidavit or brief might have been able to point more directly to the crucial evidence that was available on the issue, if it had had an opportunity to do so, and that the court might have profited by such aid, is self-evident.") *A-S-P Associates* is controlling, but on this record, I cannot hold that Defendants were given an "adequate opportunity" to oppose such an order, considering that this Court has noted that the parties are often in a better position to direct the trial court to the crucial evidence than leaving the trial court to its own devices. Thus, I would reverse the grant of summary judgment in favor of Plaintiff and remand the case.

For the reasons stated above, I respectfully write separately.