IN THE SUPREME COURT OF NORTH CAROLINA

No. 123PA24

Filed 22 August 2025

CRAIG SCHROEDER and MARY SCHROEDER

v.

THE OAK GROVE FARM HOMEOWNERS ASSOCIATION a/k/a THE OAK GROVE FARM HOMEOWNERS ASSOCIATION, INC.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 293 N.C. App. 428 (2024), reversing a judgment entered on 18 March 2022 and an order entered on 3 May 2022 by Judge Jonathan W. Perry in Superior Court, Union County, and remanding the case. On 11 December 2024, the Supreme Court allowed plaintiffs' conditional petition for discretionary review as to additional issues. Heard in the Supreme Court on 22 April 2025.

*John F. Bloss and Margaret M. Chase for plaintiff-appellees.*

*Jeffrey B. Kuykendal and Colin E. Scott for defendant-appellant.*

EARLS, Justice.

This case involves a dispute between the Schroeders and their homeowners association over the applicability of a restrictive covenant. The Schroeders' home is subject to a declaration of restrictive covenants which, among other things, prohibits keeping animals on their property, other than three or fewer horses, unless they are household pets not used for a commercial purpose. The Schroeders maintained that

the prohibition did not apply because their backyard chickens are household pets. Their homeowners association disagreed that the chickens were their pets and asked the Schroeders to remove the chickens from their property.

After a fair trial, the jury ultimately concluded that in all of the circumstances of this case, the Schroeders' chickens were not household pets. The jury's verdict reflected the "commonsense judgment of the community" as to the issues presented, *State v. Scott*, 314 N.C. 309, 312 (1985) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975)), consistent with the "fundamental right to trial by jury in civil cases which is guaranteed by our Constitution," *In re Will of Buck*, 350 N.C. 621, 626 (1999). That verdict was supported by "more than a scintilla of evidence," and the trial court correctly denied the Schroeders' motion for judgment notwithstanding the verdict (JNOV). *See Vanguard Pai Lung, LLC v. Moody*, 387 N.C. 376, 379 (2025) (quoting *Morris v. Scenera Rsch., LLC*, 368 N.C. 857, 861 (2016)). We therefore reverse the judgment of the Court of Appeals.

## I.  Background

### A. Facts

The Oak Grove Farm subdivision is a planned community located in Union County. In 1996, the developer recorded a "Declaration of Covenants Restrictions and Easements" and created defendant Oak Grove Farm Homeowners Association (Homeowners Association) to "preserve the values" of the community by, among other things, enforcing the restrictive covenants. One of these covenants reads:

13. <u>LIVESTOCK</u>. A maximum of three horses may be kept and stabled on any lot or combination of adjoining lots under common ownership. . . . No other animals, livestock, or poultry of any kind, shall be raised, bred, or kept on any lot, except that dogs, cats, or other household pets, may be kept provided that they (including horses) are not kept, bred, or maintained for any commercial purpose. No dog kennels of any type shall be kept or maintained on the property.

In 2017, plaintiffs Mary and Craig Schroeder purchased a home in the Oak Grove Farm subdivision. Almost immediately after moving in, the Schroeders purchased their first five chickens and kept them in a temporary coop located in their garage. The Schroeders soon built a larger coop outside and added more chickens to their flock. At its largest, the Schroeders' flock included approximately sixty chickens of various sizes and breeds.

On 11 March 2020, the Homeowners Association sent the Schroeders a letter asking them to remove their chickens. The letter referenced the livestock provision quoted above and indicated that failure to comply could result in fines. The Schroeders provided a written response and appeared at a hearing before the Homeowners Association's Board of Directors where they argued that their flock of chickens fell within the "household pets" exception. The Homeowners Association did not agree, and it notified the Schroeders that they needed to remove their chickens and that they would be fined $100 per day until they complied. The Schroeders then initiated this lawsuit.

**B. Procedural History**

In their complaint, the Schroeders requested a declaratory judgment that they were not violating the restrictive covenant at issue, an injunction prohibiting the collection of any fines and interference with the Schroeders' use of their property, and an award of money damages for the Homeowners Association's alleged selective enforcement of the restrictive covenant and breach of fiduciary duties. The Homeowners Association filed an answer and counterclaim seeking a declaratory judgment that the Schroeders were violating the restrictive covenant and seeking an injunction ordering the Schroeders to comply with the restrictive covenant. Prior to trial, the parties each moved for summary judgment, which the trial court denied after concluding that there were disputed questions of fact that needed to be resolved by a jury.

At trial, the Schroeders introduced a plethora of evidence tending to show that they treated their chickens like any other well-loved household pet. Ms. Schroeder testified that every chicken had a name, knew its name, and would come when its name was called. The Schroeders introduced video exhibits of Ms. Schroeder playing with the chickens. Ms. Schroeder testified that she spent "[o]ne and a half to two hours at least a day" with the flock and that she formed personal relationships with each chicken and paid close attention to their veterinary needs. The Schroeders testified that they never ate any of their chickens and they did not sell their eggs. Other witnesses generally agreed that Ms. Schroeder had an affectionate relationship with her chickens.

The Homeowners Association, however, also put on evidence. It focused primarily on the number of chickens in the Schroeders' flock—more than sixty chickens at times—as evidence that the chickens were something other than simple household pets. It also developed testimony on cross-examination that Mr. Schroeder did not know the names of many of the chickens, even though he knew the names of the family's other pets. Furthermore, the Homeowners Association introduced evidence that contradicted the Schroeders' testimony that they never sold eggs; in a Facebook post Ms. Schroeder wrote, "I sell farm fresh eggs."

During the trial, each party moved for a directed verdict. The trial court denied these motions. The parties also disputed the jury instructions. The Schroeders proposed several nonpattern instructions concerning the presumption that ambiguities in real covenants should be resolved in favor of the free use of land, a series of instructions defining the term "household pets," and an instruction on Rule 30(b)(6) depositions. *See* N.C.G.S. § 1A-1, Rule 30(b)(6) (2023). The Homeowners Association objected to each of these proposed nonpattern instructions. The trial court ultimately rejected the nonpattern instructions and framed the issues for the jury as follows:

> 1. Were the chickens that were raised, bred, or kept on the Plaintiffs' property household pets?
>
> 2. <u>Only to be reached if the answer to issue (1) is answered in the affirmative</u>: Were the plaintiffs' chickens kept, bred, or maintained for any commercial purpose?

At the conclusion of the trial, but prior to the jury returning a verdict, the

parties reached an agreement whereby the Schroeders voluntarily dismissed their claim for "selective enforcement/breach of fiduciary duties" with prejudice; each party agreed to waive any right to pursue attorney's fees; and the parties agreed that if the jury returned a verdict in favor of the Homeowners Association, the Schroeders would be liable for $31,500.

The jury returned a unanimous verdict in favor of the Homeowners Association. It answered "no" to the first issue, indicating that it did not believe that the Schroeders' chickens were household pets. Consistent with the trial court's instructions, the jury did not answer the second issue. After the jury was dismissed, the trial court denied the Schroeders' motion for JNOV.

## C. Decision of the Court of Appeals

The Schroeders appealed to the Court of Appeals and argued (1) that the trial court should have granted their motion for a directed verdict and later for JNOV, (2) that the trial court should have allowed their counsel to read excerpts from caselaw to the jury during closing arguments, (3) that the trial court should have adopted their proposed nonpattern jury instructions, and (4) that the trial court should have admitted certain evidence of local ordinances defining the term "animal."

The Court of Appeals addressed only the first issue and held that the trial court should have granted the Schroeders' motions for a directed verdict and for JNOV. *Schroeder v. Oak Grove Farm Homeowners Ass'n*, 293 N.C. App. 428, 449 (2024). The Court of Appeals first concluded that the restrictive covenants allowed the Schroeders

to keep their chickens so long as they were treated as household pets and not used for commercial purposes. *Id.* at 436. The Court of Appeals then held, even under the demanding standard for JNOV, that the "evidence of the relationship between [the Schroeders] and the chickens is not in dispute" and "there was not even a scintilla of evidence that [the Schroeders'] chickens were not household pets or that [the Schroeders] had any commercial purpose for keeping the chickens." *Id.* at 442, 449. Accordingly, the Court of Appeals concluded that the Schroeders were entitled to a judgment in their favor as a matter of law. *Id.* at 449.

This Court allowed the Homeowners Association's petition for discretionary review as well as the Schroeders' conditional petition for discretionary review of additional issues on 11 December 2024.

## II.    Analysis

### A. Standard of Review

We review a decision of the Court of Appeals for errors of law. N.C. R. App. P. 16(a). A trial court's ruling on a motion for JNOV is reviewed de novo on appeal. *Est. of Savino v. Charlotte-Mecklenburg Hosp. Auth.*, 375 N.C. 288, 293 (2020). The standard for granting JNOV "is quite demanding and the motion should be granted cautiously and sparingly." *Vanguard Pai Lung, LLC*, 387 N.C. at 379 (cleaned up). In considering the motion, the court "must view all the evidence that supports the non-movant's claim as being true." *Bryant v. Nationwide Mut. Fire Ins. Co.*, 313 N.C. 362, 369 (1985).

Moreover, all "evidence must be considered in the light most favorable to the non-movant, giving to the non-movant the benefit of every reasonable inference that may legitimately be drawn from the evidence with contradictions, conflicts, and inconsistencies being resolved in the non-movant's favor." *Id.* Thus, to survive a motion for JNOV, the nonmovant need only point to "more than a scintilla of evidence" that supports its claim—that is, anything "more than raw suspicion, conjecture, guess, surmise, or speculation." *Vanguard Pai Lung, LLC*, 387 N.C. at 379–80 (cleaned up). The standard of review for a motion for JNOV and a motion for a directed verdict are identical. *Keith v. Health-Pro Home Care Servs., Inc.*, 381 N.C. 442, 455 (2022).

Challenges to a trial court's jury instructions are also reviewed de novo. *Chisum v. Campagna*, 376 N.C. 680, 698–99 (2021). In evaluating the validity of a party's challenge to the trial court's failure to deliver a particular jury instruction, "we consider whether the instruction requested is correct as a statement of law and, if so, whether the requested instruction is supported by the evidence." *Minor v. Minor*, 366 N.C. 526, 531 (2013). Even if a trial court's jury instructions are legally erroneous, however, remand for a new trial is inappropriate unless it is shown that "a different result would have likely ensued had the error not occurred." *Chappell v. N.C. Dep't of Transp.*, 374 N.C. 273, 282 (2020) (cleaned up).

A trial court is entrusted with "broad discretion to control the scope of closing arguments" and we accordingly review for abuse of discretion. *State v. Cummings*,

361 N.C. 438, 465 (2007); *see also Watson v. White*, 309 N.C. 498, 508 (1983). An "abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Chappell*, 374 N.C. at 280 (cleaned up).

Likewise, a trial court's decision to exclude evidence under Rule 403 will only be disturbed if the decision amounted to an abuse of the court's discretion. *State v. Richardson*, 385 N.C. 101, 147 (2023); *see also* N.C.G.S. § 8C-1, Rule 403 (2023). Additionally, a decision to effectively exclude evidence is subject to harmless error analysis. *State v. Cotton*, 329 N.C. 764, 767 (1991); N.C.G.S. § 1A-1, Rule 61 (2023).

## B. Directed Verdict and Judgment Notwithstanding the Verdict

The trial court correctly denied the Schroeders' motions for a directed verdict and for JNOV because there was more than a scintilla of evidence that their chickens were not household pets. The Court of Appeals committed legal error when it reversed that judgment.

First, there was evidence that the Schroeders kept more than sixty chickens. When asked on cross examination if she really believed that she could have "whatever number you want as long as they're your pets," Ms. Schroeder was ambivalent stating, "I don't know how to answer that. I don't know." When asked if someone could keep sixty cats as household pets, Ms. Schroeder testified, "If somebody wanted 60 cats, I don't know. I don't know."

In any event, the Schroeders repeatedly testified that they had a close, loving

relationship with "each" and "[e]very one" of their chickens. But the evidence also showed that they spent "[o]ne and a half to two hours" each day with their chickens; in other words, about two minutes per day per chicken.

The trial testimony also revealed that the Schroeders did not recall the names of all of their chickens, or even the precise number of chickens they had. While Mr. Schroeder could remember the names of the family's pet horses, dogs, cats, and geckos, he could not remember most of the chickens' names. Even Ms. Schroeder testified that she could not remember owning one particular rooster named "Elvis." And while the Schroeders offered explanations for *why* they did not know exactly how many chickens were in their flock, the record reveals that when Ms. Schroeder was directly asked to "be as clear as possible" about the number of chickens, she declined to give an exact number and only testified that "[i]t's possible" that there were "approximately" sixty chickens.

When this evidence is viewed in the light most favorable to the Homeowners Association, it permits the conclusion that the Schroeders did not, in fact, have a close relationship with each individual chicken in the same way that most people form a relationship with their dog, cat, or other household pet.

Second, there was conflicting evidence as to what the Schroeders did with the eggs laid by their chickens. Ms. Schroeder testified that she "never sold eggs" because her family "ate a lot of eggs so [she] didn't really ever get many extras." When pressed, however, Ms. Schroeder confirmed that her husband "traveled a lot," that she "was

only eating one a day," that her "daughter would only eat like one scrambled egg on the weekend," and that "by the end of the week" there would be "a couple dozen" leftover eggs.

The Homeowners Association also introduced a Facebook post by Ms. Schroeder that stated, "I sell farm fresh eggs but I often have extras." When another user commented, "Where do you sell fresh farm eggs?" Ms. Schroeder replied with her location. In an attempt to reconcile this discrepancy, Ms. Schroeder testified that she was merely "embellish[ing]" when she stated on Facebook that she sold eggs and told a potential customer where they could buy them.

Ms. Schroeder is no doubt correct that she "wouldn't be the first one to embellish something on Facebook," and the jury was certainly free to believe her and refrain from drawing any negative inference about her character for truthfulness. But the jurors, "the sole judges of the witnesses' credibility," were also free to go the other way. *Ward v. Carmona*, 368 N.C. 35, 37–38 (2015). Given that an appellate court's role in reviewing a motion for JNOV is to resolve all discrepancies in the nonmovant's favor, this evidence so viewed would permit the jury to conclude that Ms. Schroeder did sell eggs and that her testimony otherwise—indeed, her testimony on any topic—was not credible.

Contrary to the holding of the Court of Appeals and the arguments of the Schroeders, we are not persuaded that the trial court refused to interpret the covenants as a matter of law. When charging the jury, the trial court did not simply

ask them to decide if the Schroeders "violated the covenants"—even though the Homeowners Association explicitly requested this framing of the issue. Instead, the trial court correctly tasked the jury with resolving the two relevant disputed questions of fact: were the chickens household pets, and were the chickens kept, bred or maintained for a commercial purpose. The trial court arrived at this framing of the issues precisely because it construed the language of the covenants as a matter of law and recognized that they potentially permit keeping chickens via the household pets exception, notwithstanding the language purporting to ban keeping "poultry of any kind." This also appears to be why the trial court denied the Homeowners Association's motion for summary judgment and its motion for a directed verdict.

The trial court's interpretation appropriately construes the language of the restrictive covenants "in favor of the free use of land" without "contradict[ing] the plain and obvious purpose of the contracting parties." *Armstrong v. Ledges Homeowners Ass'n*, 360 N.C. 547, 555 (2006) (emphasis omitted). Specifically, this construction correctly establishes that the language purporting to ban all "animals, livestock, or poultry of any kind" is limited by the broad exception for "household pets" that are not "kept, bred, or maintained for any commercial purpose." At the same time, the trial court's reading of the restrictive covenants properly recognizes that the drafters intended to impose some limits on the animals that homeowners could keep on their land and avoids contradicting this "plain and obvious purpose." *See id.*

In sum, the jury was properly asked to sort through the competing evidence

introduced at trial to determine whether the chickens were household pets or not. There was more than a mere "scintilla" of evidence that the chickens were not household pets. *See Vanguard Pai Lung, LLC*, 387 N.C. at 379 (cleaned up). The Court of Appeals erred when it reached the opposite conclusion, and we reverse its judgment.

**C. The Jury Instructions**

Next, the Schroeders argue that the trial court erred by declining to provide several nonpattern jury instructions. This argument is without merit.

The Schroeders' ten requested nonpattern jury instructions fall into three categories: the first four are statements of law concerning the interpretation of restrictive covenants. The next five are recitations and interpretations of dictionary definitions of the words "poultry," "pet," and "household." The last instruction concerns Rule 30(b)(6) depositions.

First, the trial court correctly declined to instruct the jury on how to interpret restrictive covenants because the jury was not being asked to interpret any restrictive covenants. As discussed above, the trial court interpreted the restrictive covenants as a matter of law and then asked the jury to decide two fact issues: whether the chickens were household pets, and whether the chickens were used for a commercial purpose. To resolve those issues, the jury did not need to know anything about how North Carolina courts interpret ambiguities in restrictive covenants generally, and such an instruction would have likely confused the jury. It was proper to reject these

requested jury instructions. *See Muse v. Seaboard Air Line Ry. Co.*, 149 N.C. 443, 452 (1908) ("It is well settled, that when the charge given presents every phase of the controversy, with correct instructions as to the law, a new trial will not be awarded for failure to give instructions asked, although they may involve correct propositions of law.").

Next, it was not error to refuse to instruct the jury on how a certain dictionary defined the terms "poultry," "pet," and "household." Here, the phrase "household pet" is undefined in the restrictive covenants, and the trial court correctly held that the phrase must be accorded its ordinary meaning. A trial court is not required to read the jurors dictionary definitions of common, ordinary words because "a jury is presumed to have understood the plain English contained in the trial court's instruction." *State v. Weeks*, 322 N.C. 152, 175 (1988) (cleaned up) (holding it was not error for the trial court to refuse to define the word "satisfaction" for the jury); *see also State v. Franks*, 300 N.C. 1, 17–18 (1980). In any event, the trial court permitted counsel to read the proffered dictionary definitions to the jurors during closing arguments, undermining any claim that the jurors were "left without any guidance" on this issue.

Finally, it is not clear from the record why the nonpattern instruction on Rule 30(b)(6) depositions was requested. This issue was abandoned in the briefs and we decline to analyze it. N.C. R. App. P. 28(a) ("Issues not presented and discussed in a party's brief are deemed abandoned.").

**D. Closing Arguments**

Next, the Schroeders argue that the trial court erred when it refused to allow their counsel to read excerpts from *Steiner v. Windrow Estates Home Owners Association*, 213 N.C. App. 454 (2011), and from *Russell v. Donaldson*, 222 N.C. App. 702 (2012) to the jury in closing arguments. However, the trial court's decision was appropriate. It is well settled that "counsel may not read the facts contained in a published opinion together with the result to imply that the jury in his case should return a favorable verdict for his client." *State v. Gardner*, 316 N.C. 605, 611 (1986). Here, many of the passages from *Steiner* that counsel sought to read were entirely comprised of the facts of that case. The trial court correctly denied counsel's request to read these facts to the jury. *See id.*

Moreover, counsel may only read statements of law "which are relevant to the issues before the jury." *Id.* For the reasons explained above, the jury was not asked to interpret any restrictive covenant. Accordingly, the excerpts from *Steiner* and *Russell* that deal with North Carolina law's presumption in favor of the free use of land when interpreting restrictive covenants were not relevant to the actual issues put before the jury. The trial court correctly denied counsel's request to read these quotes to the jury. *See id.*

Finally, as to the dictionary definitions of common words such as "pet" and "household" that were quoted in the *Steiner* opinion, the trial court allowed counsel to read those definitions to the jury. During the charge conference, the trial court

wisely explained:

> THE COURT: . . . [T]o stand up and say well North Carolina case law or the *Steiner* case or General Statute X, Y and Z says this, that would not be appropriate, again given *Steiner*. But I think any reference to a dictionary, so in the closing arguments you could say for example [Merriam]-Webster's definition of poultry is such and such or Britannica's definition of poultry is such and such. I think that would be appropriate. Again what I'm trying to do is make sure there's no citations to legal sources of authority given *Steiner*'s instruction that it should be based on the ordinary meaning of the words.

The jury was required to decide the issues based on their own understanding of the ordinary meaning of those words and did so here. It was not error to prohibit counsel from suggesting that a particular dictionary definition of the term "pet" or "household" carried the force of law. *Cf. Weeks*, 322 N.C. at 175 (concluding that it is not error to refuse to define common, ordinary words in jury instruction). We will not disturb the jury's verdict on these grounds.

### E. Exclusion of Evidence

The Schroeders' final argument is that the trial court erroneously excluded evidence at trial. Specifically, a different clause in the restrictive covenants titled "Pets" requires homeowners to keep any "animal as defined by the Union County Animal Control Ordinance" fenced in or otherwise on a leash. The Schroeders wanted to introduce the text of that Union County Animal Control Ordinance, which defines "animal" as "any live, vertebrate creature, wild or domestic, other than human beings, endowed with the power of voluntary motion."

It appears that the Schroeders wanted to use this evidence because they feared that the jurors might believe that chickens could *never* be household pets, under any circumstances. To combat that risk, their plan was to argue that the restrictive covenants had incorporated the Union County Animal Control Ordinance's definition of "animal" as its own internal definition of the word "pet"—in other words, that the "household pets" exception definitively covered "any live, vertebrate creature, wild or domestic, other than human beings, endowed with the power of voluntary motion."

This trial strategy, even if well intentioned, is fundamentally misleading, and the trial court correctly sustained the Homeowners Association's objection. The specific provision in the restrictive covenants at issue in this case is not the "pets" provision but the "livestock" provision. That provision prohibits "animals, livestock, or poultry of any kind" except for "household pets" not used for any commercial purpose. The phrase "household pets" is, all parties agree, not defined anywhere in the restrictive covenants. Accordingly, it would have misled the jury if the Schroeders had been permitted to argue that the term "household pets" was defined in the covenants when, in reality, it was not. The trial court did not abuse its discretion when it excluded this evidence.

Finally, we note that there is no reason to believe that the jury was misled by the exclusion of this evidence. Counsel was permitted to argue in closing that the ordinary meaning of the term "household pets" included chickens and was even allowed to quote directly from the dictionary for support. Moreover, the jurors were

specifically asked to decide whether these chickens were household pets. The very exercise of asking the question communicated that the answer was uncertain and that the jurors were free to decide that the Schroeders' chickens were their household pets. The fact that they returned a verdict for the Homeowners Association does not mean that they were misled.

### III.    Conclusion

The Schroeders received a fair trial free from prejudicial error. They were not entitled to a directed verdict or JNOV because there was more than a scintilla of evidence that their chickens were not household pets. This was an issue of fact for the jury to decide based on the ordinary meaning of the words in the restrictive covenants. We reverse the judgment of the Court of Appeals.

REVERSED.

Justice RIGGS dissenting.

If this case boiled down to a question as simple as, "Is a chicken a pet?," then my disagreements with the majority might collapse.[1]  Instead, this case represents a significant development in the law applicable to a specific species of contracts—community interest covenants (CIC) or restrictive covenants.   Furthermore, the majority gives insufficient weight to the longstanding rule that "covenants are strictly construed in favor of the *free use of land* whenever strict construction does not contradict the plain and obvious purpose of the contracting parties."  *Armstrong v. Ledges Homeowners Ass'n*, 360 N.C. 547, 555 (2006); *see also, Long v. Branham*, 271 N.C. 264, 268 (1967) ("Covenants and agreements restricting the free use of property are strictly construed against limitations upon such use. Such restrictions will not be aided or extended by implication or enlarged by construction to affect lands not specifically described, or to grant rights to persons in whose favor it is not clearly shown such restrictions are to apply.   Doubt will be resolved in favor of the unrestricted use of property, so that where the language of a restrictive covenant is capable of two constructions, the one that limits, rather than the one which extends

---

[1] And comedians might have as much fun with this case as they have had posing the question, "Is a hotdog a sandwich?" to United States Supreme Court justices.  The Late Show with Stephen Colbert, *Stephen Works Out With Ruth Bader Ginsburg*, at 2:40 (Youtube, streamed Mar. 21, 2018), https://www.youtube.com/watch?v=0oBodJHX1Vg; The Late Show with Stephen Colbert, *Justice Sonia Sotomayor Allows Stephen to Approach the Bench*, at 7:23 (Youtube, streamed Nov. 17, 2018), https://www.youtube.com/watch?v=KAd4HxJekH4.

it, should be adopted, and that construction should be embraced which least restricts the free use of the land." (cleaned up)).

While the law in this area is still developing, the Court of Appeals firmly adopts the reasoning of a line of cases that hold that ambiguous contract terms are questions of law for the court, not a jury. *Schroeder v. Oak Grove Farm Homeowners Ass'n*, 293 N.C. App. 428, 432 (2024); *see also Erthal v. May*, 223 N.C. App. 373, 378 (2012); *Coletrane v. Lamb*, 42 N.C. App. 654, 657 (1979). I do not think that, in the context of restrictive covenants, the rule is that simple, and I disagree with the Court of Appeals on that front. In the context of restrictive covenants, in order to reconcile the command that any ambiguities be resolved in favor of the free use of land with the duty of the jury to decide issues of fact, our trial courts have a greater responsibility to identify whether ambiguities exist and then if that ambiguity cannot be resolved as a matter of law, define with some precision the factual disputes that give rise to the ambiguity. It seems clear here that the trial court did believe that some ambiguity existed in the term "household pets," but the specific factual dispute the jury needed to resolve is not clear from the jury instructions.

For example, it seems clear that there was a factual dispute about the relevance of the difference between Mr. Schroeder's and Ms. Schroeder's feelings toward the chickens. Both the Schroeders' names are on the property deed and were listed on the compliance documentation from the homeowner's association (HOA). But the restrictive covenant's reference to household pets does not specify who in the

household must consider the animal a pet in order for the pet to be allowable. It is possible that the intention of the original drafter of the HOA agreement was that every member of the household must consider the animal to be a pet. If that is true, I will grant that a scintilla of evidence was provided that Mr. Schroeder did not consider all of the chickens to be pets. But the drafters of the HOA covenant were not specific on this front, and as such, the ambiguity must, as a matter of law, be construed in favor of the free use of land. As such, I would conclude that as a matter of law, only one homeowner needs to consider the animal a pet for the purposes of this inquiry. Because the jury instructions did not so clarify the actual factual question to be answered, I cannot assume that the jury did not consider the differing relationships the two separate homeowners had with the chickens. Put another way, if the jury decided that the chickens were Ms. Schroeder's pets but not Mr. Schroeder's pets, then it could have still answered the first question the way that it did: no.

This is not an inconsequential technicality. The disparity of power between HOAs drafting original restrictive covenants and homeowners who have no choice but to accept the HOA's restrictive covenants if they wish to purchase their desired home is a disparity that affects many North Carolinians. The number of North Carolinian homeowners who reside in communities governed by a restrictive

covenant is on the rise.[2]  Just as banks and other institutions of power hold disproportionate power in establishing the terms of a contract, *Taylor v. Bank of Am., N.A.*, 385 N.C. 783, 794–95 (2024) (Riggs, J., dissenting), so too here is there a disparity in power when it comes to contract drafting that should, at the very least, push us to hold the party with all the drafting power to the obligation of drafting the contracts with precision.

In failing to identify for the jury the factual dispute that gives rise to the ambiguity in the language of the restrictive covenant, the judge invited the jury to consider evidence of little or limited relevance outside of any meaningful framework. It is undisputed, obviously, that the Schroeders may have had nearly sixty chickens at some point during the period in controversy.  But what relevance does the number have in deciding whether, for purposes of the restrictive covenant, the chickens were pets?  Take, for example, an animal in which there is probably more consensus that the animal is a household pet: a dog.  I suspect that the Court would unanimously agree that a dog is a household pet, as a general proposition, if not for the purposes of this specific restrictive covenant.  If a homeowner had sixty dogs, hoarding statutes and ordinances aside, are the dogs no longer household pets because there are sixty of them?  If the number of dogs is relevant, how so?  Can ten of those dogs be

---

[2] Currently over a quarter of the state's population resides in a community with an HOA.  Gord Collins, *North Carolina Community Associations and HOAs*, ManageCasa (July 17, 2024), https://managecasa.com/articles/north-carolina-community-associations-and-hoas#:~:text=Community%20Associations%20in%20the%20State.%20About%202.756,New%20York%2C%20according%20to%20stats%20from%20Caionline.org.

considered household pets and the rest be considered something other than household pets? In answering the question posed to it, was the jury in this case being asked (and did it decide) that all the chickens were not pets? Or did the jury have the option of deciding that some of the chickens were pets, perhaps the ones who Ms. Schroeder cuddled with, watched TV with, and took on vacation? I do not profess to know the answer to that question,[3] but because I do not, the Court should remand to the trial court for further proceedings to clarify this.

To be clear, I do not fully embrace the Court of Appeals' opinion. I do not fully embrace the logic of *Erthal*, that in all cases, interpretation of ambiguous terms of a restrictive covenant is a question of law and should not be decided by a jury. 223 N.C. App. 373, 378 (2012). I also do not think we should adopt one universal definition of what is a "household pet," resolving once and for all whether chickens qualify.[4] What I am arguing is two-fold: (1) that we should not inch away from the conclusion that

---

[3] And it seems clear that to at least some members of the Court, the number of chickens mattered. *Schroeder v. Oak Grove Farm Homeowners Ass'n*, (No. 123PA24) (Apr. 22, 2025), https://www.youtube.com/watch?v=mB3zii8aEHc (last visited Aug. 18, 2025).

[4] In my mind, this resolves the question of whether enough evidence exists to support a judgment for defendant, with even the most favorable instruction to the jury and in a light most favorable to the non-moving party. *See Bryant v. Nationwide Mut. Fire Ins. Co.*, 313 N.C. 362, 369 (1985). Because the jury instructions did not identify the specific factual disputes for the jury's resolution, we cannot be sure that there was sufficient evidence for a reasonable jury to reach the conclusion that this jury reached. *See Chisum v. Campagna*, 376 N.C. 680, 710 (2021) (recognizing that this Court has held "jury verdicts to be fatally ambiguous in the event that the verdict sheet or the underlying instructions were vague, making it unclear precisely what the jury intended by its verdict"). We cannot be sure how much weight the jury gave to factual disputes, such as whose personal attachments to the animals mattered or what was the proper significance to attach to the number of the animals, or whether the Schroeders considered each chicken a pet. As such, we should remand the case for a new trial with more precise jury instructions.

ambiguities in restrictive covenants should be resolved in favor of the free use of land, and we should hold the drafters of restrictive covenants (here, the HOA) who hold the power of the pen to its burden to draft precise contract terms; and (2) that we should not absolve trial courts of the obligation to narrow questions of law before sending questions of fact to a jury. We ask too much of our juries if we do not give them the benefit of judicial experience when it comes to resolving the questions of law.

Less central to the arguments above, but still relevant, is the question of whether the trial court erred by excluding the Union County ordinance that the Schroeders attempted to enter into evidence. The covenant defined "pets" as "animal[s] . . . defined by the Union County Animal Control Ordinance." The covenant, of course, also reads that "[n]o other animals, livestock, or poultry of any kind, shall be raised, bred, or kept on any lot, except that dogs, cats, or other household pets, may be kept provided that they (including horses) are not kept, bred, or maintained for any commercial purpose." Even though our caselaw says that in determining the meaning of a restrictive covenant, the "applicable rules of interpretation require that the meaning of the contract be gathered from a study and a consideration of all the covenants contained in the instrument and not from detached portions," *Callaham v. Arenson*, 239 N.C. 619, 625 (1954), the trial judge would not allow the Schroeders to introduce the Union County Animal Control Ordinance's definition of "animal": "[A]ny live, vertebrate creature, wild or domestic, other than human beings, endowed with the power of voluntary motion." Because

the ordinance was incorporated by reference and used to define a term that is material to the restrictive covenant, I believe it was error to exclude the ordinance from evidence as part of the contract itself. *See Singleton v. Haywood Elec. Membership Corp.*, 357 N.C. 623, 629 (2003) ("[W]here a contract defines a term, that definition is to be used." (cleaned up)).

Finally, to the extent that Ms. Schroeder ever sold the eggs produced by her chickens, based upon her Facebook posts, this is a question related solely to the second question posed to the jury: whether or not the chickens, if pets, were used for commercial purposes. Because the jury declined to reach the second question, this disputed fact seems irrelevant.

For the reasons above, I respectfully dissent. I would vacate the Court of Appeals' judgment and remand to the trial court for a new trial with jury instructions that provide guidance for the factual dispute the jury must resolve.

Justice DIETZ joins in this dissenting opinion.